**FARRELL LINES INCORPORATED,**
Plaintiff,

v.

**TITAN INDUSTRIAL CORPORATION,**
Defendant.

**No. 64 AD. 1215.**

United States District Court
S. D. New York.

April 15, 1969.

Lilly, Sullivan & Purcell, New York City, for plaintiff; George Sullivan and Francis R. Matera, New York City, of counsel.

Burlingham, Underwood, Wright, White & Lord, New York City, for defendant; John S. Rogers, New York City, of counsel.

## MEMORANDUM

MacMAHON, District Judge.

Plaintiff carrier sues defendant shipper for ocean freight, plus interest, on three shipments of steel from Baltimore to Africa, carried on board two of plaintiff's vessels in February and March

1964. The case was tried to the court, without a jury, on January 31, 1969.

The parties agree that the shipments were booked on board the carrier by a forwarder, Baltimore Dispatch Corporation,[1] and that the shipper paid the forwarder for the freight.[2] The forwarder, however, did not pay the carrier and, eventually, went bankrupt.[3] The carrier commenced this action against the shipper to collect the full freight due.

The carrier claims that the shipper is obligated to the carrier for the freight, despite the shipper's payment to the forwarder. The carrier relies on the Shipping Act of 1916, 46 U.S.C. §§ 812, 814–817, and the Transportation Act, 49 U.S. C. §§ 6(7), 906(c), which compel the carrier to collect a full freight charge, in accordance with its filed tariffs, as well as the bills of lading used in these transactions which provide that the shipper is responsible for the payment of freight. We will first consider the carrier's statutory argument.

■ The carrier interprets the statutory requirement that full freight be collected as imposing a mandate on the shipper to pay the freight in accordance with the carrier's filed tariffs, regardless of whether the shipper has already paid the forwarder.[4] The carrier's statutory obligation to collect full freight was not intended, however, to impose absolute liability on a shipper, but rather to prevent price discrimination by the carrier. As long as someone is liable for the full amount of the freight, so that there is no overcharge or under-

charge, the public interest is protected and the statutes are satisfied.[5]

Absent any suggestion of price discrimination, we conclude that the statutes have no application to the facts of this case.

The carrier also relies on the bills of lading used in these transactions which provide in pertinent part:

"The shipper and consignee shall be jointly and severally liable to the carrier for payment of all freight. * * "

The carrier argues that this provision obligates the shipper to pay the carrier, regardless of the shipper's payment to the forwarder.[6] The shipper, on the other hand contends that the forwarder was the carrier's agent for receipt of payment and that payment to the forwarder constituted payment to the carrier.[7] We must, therefore, examine the underlying transactions and determine whether the forwarder was actually the carrier's agent.

Whenever the shipper had freight to send overseas, it would communicate with the forwarder[8] and advise as to the quantity of cargo to be transported, the number of the box car in which the cargo was located and the cargo's destination.[9]

The forwarder would, thereafter, make all preparations necessary for the transportation of the cargo, without direction or instruction from the shipper.[10] The forwarder would select the carrier, book passage for the cargo, arrange for delivery to the carrier's vessels and prepare the bills of lading for the carrier's signa-

1. Tr. 41; Plaintiff's Exhibit 8, p. 6.

2. Tr. 40, 41, 45; Defendant's Exhibit A.

3. Tr. 29–30.

4. Compania Anonima Venezolana de Navegacion v. A. J. Perez Export Co., 303 F. 2d 692, 695–696 (5th Cir.), cert. denied, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962); Bartlett-Collins Co. v. Surinam Navigation Co., 381 F.2d 546, 549 (10th Cir. 1967).

5. Louisville & Nashville R.R. v. Central Iron & Coal Co., 265 U.S. 59, 66, 44 S.Ct. 441, 68 L.Ed. 900 (1924).

6. Tr. 3, 4.

7. Tr. 4, 5.

8. Tr. 41, 43.

9. Plaintiff's Exhibit 8, pp. 6, 22; Tr. 43.

10. Plaintiff's Exhibit 8, pp. 6, 22, 23; Tr. 43.

**1350**

ture.[11] The forwarder was paid for these services by the carrier, based on a percentage of the freight charges,[12] in addition to a nominal payment by the shipper for clerical services.[13]

Neither the shipper nor the carrier, however, had any control over the manner in which the forwarder performed these services.[14] Moreover, the forwarder would deal with many other carriers and shippers besides the parties.[15]

Absent the critical elements of control and exclusivity, we find that the forwarder was neither the carrier's agent for receipt of payment, nor the shipper's agent in transactions with the carrier, but rather an independent contractor.

The characterization of the forwarder as an independent contractor does not, however, determine whether the bills of lading impose liability on the shipper for the forwarder's default in paying the freight charges. We turn, therefore, to consider the manner in which the carrier issued the bills of lading.

The original bills of lading used in these transactions were not introduced in evidence because, if they exist at all, they are in Africa.[16] Instead, the carrier introduced forms of unissued bills,[17] claimed to be the same forms as those used in these transactions. The unissued bills all bore the printed notice that freight charges were "To Be Prepaid." The shipper's traffic manager, Louis

Crisalli, testified that the bills actually received by the shipper had been stamped "Freight Prepaid," indicating that freight had been paid in full. The bills had to bear this notation before the bank would accept them for discount.[18] Moreover, an employee of the carrier admitted that the bills for the shipments in question could have been altered and stamped "Freight Prepaid." [19]

Based on this evidence, we find that the bills of lading for the three shipments involved were stamped "Freight Prepaid."

The freight was not, however, prepaid before the issuance of the "Freight Prepaid" bills of lading. Rather, the carrier issued the bills in exchange for Outward Freight Bills.[20] Under the terms of the Outward Freight Bills,[21] freight charges were payable either on demand, or within three days of their issuance, and constituted an extension of credit by the carrier.[22]

The shipper was not involved in this credit transaction. The shipper received only "Freight Prepaid" bills and never signed or received Outward Freight Bills.[23] Rather, the Outward Freight Bills were signed by the forwarder's messenger.[24] Moreover, the carrier's collection efforts for four months were directed solely against the forwarder,[25] until the forwarder's insolvency became apparent, and then the carrier shifted

11. *Ibid.*

12. Tr. 28, 29.

13. Tr. 43, 44.

14. Plaintiff's Exhibit 8, p. 19.

15. Plaintiff's Exhibit 8, pp. 11–13; Defendant's Exhibit A.

16. Tr. 14, 15.

17. Plaintiff's Exhibits 5, 6 and 7.

18. Plaintiff's Exhibit 8, pp. 17–18; Tr. 46–48.

19. Tr. 16–17.

20. Tr. 10, 11, 19, 20. The Outward Freight Bills were referred to in the testimony as "Due Bills" (Tr. 9), The original signed due bills were not available at trial because the carrier destroyed them in the normal course of business (Tr. 9, 10).

21. Plaintiff's Exhibits 2, 3, 4.

22. Tr. 19.

23. Tr. 46.

24. Tr. 21.

25. Tr. 31–33.

gears and attempted to collect from the shipper.[26]

We find, therefore, that the carrier extended credit in the amount of the freight due to, and looked for payment from, the carrier.

Thus, the determinative question is whether, despite the shipper's payment of the freight charges to the forwarder, the bills of lading require the shipper to pay the freight charges when the carrier unilaterally extended credit for the freight to the forwarder.

The carrier could have billed the shipper directly. Instead, for its own convenience, it chose to extend credit to the forwarder.[27] The carrier derived many benefits from this arrangement. Since shippers do not have forwarders' expertise in ocean freight, the carrier, by dealing solely with forwarders, is relieved of many of the burdensome details which unknowing shippers would thrust upon it. The carrier is also relieved from checking the credit ratings of an almost infinite number of shippers and, instead, can rely on the credit of a limited number of forwarders.

Thus, the carrier accepted the forwarder as the principal and obligor on the freight contract. Allowing the carrier to recast the transaction in a different mold because of the forwarder's insolvency would be most unjust.[28] Were the situation reversed and the shipper insolvent, it would be no defense in an action by the carrier against the forwarder for the forwarder to claim that it was not the obligor, when it is clear that the forwarder handled all aspects of the transaction and the carrier regarded the forwarder as the contracting party.[29]

We find that the carrier made a full and proper charge for the ocean freight and that it extended credit to, and looked for payment from, the forwarder by stamping the bills of lading "Freight Prepaid" and accepting in return the forwarder's signature on the due bills. We find that the shipper made full payment to the forwarder prior to the forwarder's insolvency.

 We conclude that the carrier dealt with the forwarder as shipper in fact, and therefore defendant shipper is not responsible for the forwarder's nonpayment.

The foregoing constitutes the court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a).

Accordingly, the Clerk of the court is directed to enter judgment dismissing the libel.

So ordered.

---

26. Tr. 30, 48.

27. Tr. 19, 20.

28. Missouri Pacific R.R. v. National Milling Co., 276 F.Supp. 367 (D.N.J.1967);
Alcoa S.S. Co. v. Graver Tank & Mfg. Co., 124 N.Y.S.2d 77 (N.Y.City Ct.1953).

29. Compania Anonima Venezolana De Navegacion v. Mandry, 171 F.Supp. 290 (E.D.La.1959).