**STRACHAN SHIPPING COMPANY, the Bank and Savill Line, Ltd., Empresa Lineas Maritimas Argentinas, S.A., Costa Armatori, S.p.A. Atlantic Cargo Service AB, Plaintiffs,**

v.

**DRESSER INDUSTRIES, INC., Oilfield Products Corporation (Oilfield Products Group), James Sierra & Company, Inc., Defendants.**

Civ. A. No. 79-3779.

United States District Court, E. D. Louisiana.

Jan. 21, 1982.

James O. M. Womack, New Orleans, La., for plaintiffs.

Charles Kohlmeyer, Jr., New Orleans, La., for defendants.

CASSIBRY, District Judge:

This case was submitted to the court on stipulated facts, depositions, exhibits, and briefs. After careful consideration of those materials and the applicable rules of law, I have decided in favor of the defendants. My findings and conclusions are set forth below.

## FACTS

Familiarity with the facts which have been stipulated to in the Joint Stipulation of Facts, filed on February 3, 1981, is assumed. The plaintiffs [1] in this case, four

1. Plaintiff, the Bank and Savill Line, Ltd. was the operator of the M/V MORAYBANK and M/V LAGANBANK; plaintiff, Empresa Lineas Maritimas Argentinas, S. A. was the operator

of the M/V RIO MARAPA; plaintiff, Costa Armatori, S.p.A. was the operator of the M/V GIOVANNA C; plaintiff, Atlantic Cargo Service AB was the operator of the M/V FINN-

shipping lines and their steamship agent (the agent is "Strachan"), have sued for unpaid freight and stevedoring costs. These charges were paid by the defendant, Dresser, Industries, Inc. ("Dresser"), to the freight forwarder, James Sierra & Company ("Sierra"), but Sierra failed to remit the payments to the plaintiffs. On November 28, 1979, Sierra filed for a Chapter XI Corporate Reorganization, and thus any recovery from Sierra is unlikely.

On October 24 and October 30, 1978, as well as on January 13, 16, and 19, 1979, Dresser shipped cargo on vessels operated by the four plaintiff steamship lines. Freight for these shipments became due in the amount of $115,998.01. Between the months of December 1978 through February 1979, Strachan provided stevedoring and car unloading services for Dresser, for which the sum of $9,553.43 became due.

For each of the above-mentioned shipments, Dresser contacted Sierra, and Sierra then booked space on one of the shipping lines' vessels. The shipping lines paid Sierra a brokerage commission for each booking. When the vessel had departed the Port of New Orleans, the bills of lading signed by Strachan as agent for the plaintiff shipping lines were given to Sierra for forwarding to Dresser. The negotiable original of each bill of lading, marked "Freight Prepaid", was delivered to Dresser through Sierra. On a non-negotiable copy of the bill of lading, Strachan stamped a clause entitled "Freight Due Bill" which provided that freights were past due 15 days after the sailing of the vessel. This copy of the bill of lading was given to Sierra as an invoice, and the amount of freight due was computed in the appropriate box on the "Due Bill." Sierra then prepared its own invoice to Dresser, including the amount due for freight as well as the amount due for Sierra's services. When Dresser received the invoice from Sierra, it sent its check to Sierra for the amount invoiced.

The normal procedure was for Sierra to then remit the amount due for freight to Strachan. However, for the five shipments and stevedoring charges upon which this suit is based, Sierra did not remit the payments to Strachan, but instead presumably diverted the monies to other uses.

Although all shipments occurred from October 1978 through January 1979, and the stevedoring services were performed from December 1978 through February 1979, Dresser's first notice that Strachan had not received its payment was on April 17, 1979, when a representative of Strachan contacted Dresser. As previously mentioned, by the terms of the Freight Due Bills, freights were past due 15 days after the sailing of the vessel.

Plaintiffs argue that regardless of Dresser's payments to Sierra, Dresser must still pay plaintiffs for the freight and stevedoring charges which Sierra failed to remit to plaintiffs. In support of their claim, plaintiffs first contend that Dresser is absolutely liable for payment under all circumstances based on the language of a Conference Credit Agreement that Dresser signed. Dresser, on the other hand, argues that under such a credit agreement the parties were bargaining for credit privileges and not over who would ultimately be responsible for payment.

Secondly, plaintiffs contend that Sierra was Dresser's agent, and that Dresser is, therefore, responsible for the failure of its agent (Sierra) to remit the funds owing to plaintiffs. Dresser admits that Sierra was its agent for certain purposes such as the preparation of export documents, but claims that Sierra was plaintiffs' agent for purposes of collection. Thus, under Dresser's theory, payment to Sierra would satisfy Dresser's obligation to pay plaintiffs. In addition, Dresser claims that in any event plaintiffs should be equitably estopped from making Dresser pay twice because plain-

SAILOR. All plaintiffs are foreign steamship companies, operating vessels between New Orleans and foreign ports. Plaintiff, Strachan Shipping Company ("Strachan") acts as agent for the other plaintiffs in addition to various other steamship lines. Strachan also performs stevedoring and car unloading services in the Port of New Orleans.

tiffs delayed far beyond the 15 day period specified in the Freight Due Bills before informing Dresser that Sierra had not properly remitted payment to plaintiffs.

## LAW

There are two separate and independent grounds upon which plaintiff asserts that Dresser could be found liable: (1) the Conference Credit Agreement, and (2) principles of agency.

### (1) The Conference Credit Agreement

One of the plaintiff shipping lines [2] was a member of the U.S. Atlantic And Gulf/Australia-New Zealand Conference (the "Atlantic and Gulf Conference"). Dresser, as a shipper, had signed the Conference Agreement. By this agreement, Dresser agreed to confine its shipments within this geographic area to vessels of the carriers that were party to the Atlantic and Gulf Conference, and the carriers agreed to provide contract rates only to those merchants bound by the Atlantic and Gulf Conference rate agreement. In order for the bills of lading marked "prepaid" to be released before the freight had been received by the carrier, members of the Atlantic and Gulf Conference entered into a Shippers' Credit Agreement. This credit agreement reads in relevant part:

### SHIPPERS' CREDIT AGREEMENT

In consideration of the extension of credit through the issuance and release of bills of lading indicating that freight is payable on other than a freight collect basis by members of the U.S. Atlantic & Gulf/Australia-New Zealand Conference to us directly or through our forwarder or agent we hereby agree as follows:

1. To pay to the carrier, or his agents, either directly or through our forwarder or agents, within fifteen working days, excluding Saturdays, Sundays and legal holidays, after the date of the sailing of the vessel from port of loading all freights and charges due on such bill of lading.

2. We will be absolutely and unconditionally responsible to see that all freights and charges due are paid within the fifteen (15) day period, and guarantee that they will be paid to the carrier or his agent regardless of whether or not funds for such payment have been advanced to our forwarder/agent or otherwise.

3. Credit privileges hereunder shall be immediately suspended for any failure to comply with the provisions of this agreement.

Plaintiffs contend that this language makes Dresser absolutely liable for the payments that Sierra failed to remit to the plaintiffs. A similar argument was presented to the court in *Koninklijke Nedlloyd BV v. Uniroyal, Inc.*, 433 F.Supp. 121 (S.D.N.Y.1977) *("Uniroyal")*. In that case, the court held that under such a credit agreement the parties were bargaining for credit privileges and not over who would ultimately be responsible for payment. The credit agreement in *Uniroyal*, quoted below, contains language almost identical to that of the Atlantic and Gulf Conference credit agreement at issue in this case. The *Uniroyal* agreement states, in relevant part:

(d) In consideration of granting credit to us directly or to our duly authorized forwarder by the issuance and release of the bills of lading indicating that ocean freight is payable to any number of The "8900" Lines at United States Atlantic and Gulf Ports served by such members, we hereby undertake and agree as follows:

\*　　\*　　\*　　\*　　\*　　\*

2. We will be absolutely and unconditionally responsible to the Carrier for payment of all freight and charges due within fifteen (15) business days (Saturdays, Sundays, and Holidays excepted) of the sailing of the vessel from the respective port of loading and guarantee that they will be paid within that period, irrespective of whether or not funds for pay-

---

**2.** The Bank and Savill Line, Ltd.

ment have been advanced to the forwarder or otherwise.

*Uniroyal* at 125–26.

The *Uniroyal* court determined that the most reasonable interpretation of this agreement was that the parties were bargaining for credit privileges and not over who would ultimately be responsible for payment.

> The introductory clause uses the language 'in consideration of granting credit to us [directly] or to our duly authorized forwarder;' and ¶ 2 states that Uniroyal is to be responsible not for payment but for payment within fifteen (15) business days. The guaranty given was not that the shipper would in all events make good any default by the forwarder, but only that payment would be made within the agreed upon credit period. It is the time of the payments which is at the heart of this Agreement. And the final clause in ¶ 2 shows only that the carrier wanted to be assured of prompt payment, even though the shipper may not have advanced funds to the forwarder in time to meet the deadline. It does not purport to deal with the rights and obligations of the parties, where, as here, the shipper pays the forwarder and the latter fails to remit funds to the carrier. The plaintiff cannot now seek to transform the Credit Agreement into an absolute undertaking to pay under any and all circumstances.

*Uniroyal* at 126. The court also held that the credit agreement did not address the problems of a defaulting forwarder, but rather the situation where a carrier is unable to collect from the consignee.

■ I find the plaintiffs' argument that the language of the *Uniroyal* credit agreement is materially distinguishable from that of the credit agreement involved in this case to be without merit. Both of these agreements merely stipulate the period of time within which payment is to be made. It should be noted that the agreement involved in this case provides that for failure to comply with the provisions of the agreement, the shipper merely loses his credit privileges. Nowhere does the credit agreement state that the shipper becomes absolutely liable for funds which a forwarder converts to his own uses rather than properly remitting them to the carrier.

Since the credit agreement involved in this case was not designed to deal with the problem of who must ultimately bear the loss in the present situation, plaintiffs' claim that Dresser's signature on the Conference Credit Agreement alone makes it liable for the payments Sierra failed to remit cannot be sustained.[3]

*(2) Agency Principles*

Plaintiffs claim that Sierra was Dresser's agent and that, therefore, Dresser must be responsible for the failure of its agent to remit the funds to plaintiffs. Dresser contends that although Sierra may have been its agent for some purposes, Sierra was plaintiffs' agent for purposes of collection. Thus, Dresser asserts that the payments to Sierra satisfied Dresser's obligation to pay plaintiffs.

The precise status of a freight forwarder is a matter which is not free from doubt. However, I find that in this case the facts establish that Sierra was plaintiffs' agent for receiving payment. "That the freight forwarder was defendant's agent for arranging the shipment did not prevent it from acting as plaintiff's agent for receiving payments." *Alcoa S.S. Co. v. Graver Tank & Mfg. Co.*, 1953 A.M.C. 844, 845 (N.Y. City Ct. 1953) ("*Alcoa*").

The stipulated facts indicate that for all of the shipments involved in this case, a prepaid bill of lading was issued to Sierra without actual prepayment of the freight charges having been made. (See "Joint Stipulation of Facts," 7–11). I find that this transaction must be construed as an extension of credit by the plaintiffs to Sierra, and as such, it is Sierra, not Dresser,

---

**3.** It must be noted that of all of the plaintiffs, only the Bank and Savill Line, Ltd. was a member of the Atlantic and Gulf Conference. None of the other plaintiffs had such a credit agreement with Dresser. Thus, even if this credit agreement rendered Dresser liable for payment, it would be applicable only to the shipments on the Bank and Savill Line.

that is liable. *See, Farrell Lines, Inc. v. Titan Industrial, Inc.*, 306 F.Supp. 1348 (S.D.N.Y.1969), *aff'd.*, 419 F.2d 835 (2d Cir. 1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970), ("*Farrell*"); *Uniroyal, supra; Inversiones Navieras Imparca, C.A. v. Polysar International, S.A.*, 465 F.Supp. 102 (S.D.Fla.1979) ("*Polysar*"); *West India Industries, Inc. v. Vance & Sons AMC/Jeep*, No. H–79–180 (S.D.Tex., March 14, 1980) ("*West India*"). "To allow a carrier 'to recast the transaction in a different mold because of the forwarder's insolvency would be most unjust.'" *Farrell, supra*, at 1351.

■ The plaintiffs maintain that the use of the bill of lading, designated "freight prepaid," identifying the freight forwarder as the forwarding agent for the shipper (Dresser) was consistent with billing for the account of Dresser and not Sierra. I find this contention contrary to the facts surrounding the issuance of the bills of lading herein and the interpretation given such transactions in the cases of *Farrell, Uniroyal, Polysar*, and *West India, supra*.

In addition, the evidence is undisputed that the plaintiffs initially looked to Sierra for payment. (Deposition of Bryant, pp. 40–41; 44–45. Deposition of Boyer, pp. 8–10). Plaintiffs' collection efforts for several months were directed solely against Sierra; the demand upon Dresser for payment was a mere afterthought. The fact that plaintiffs did not make any demand for payment upon Dresser until after plaintiffs had dunned Sierra without success, reveals plaintiffs' initial understanding that Dresser was not liable. I conclude, therefore, that the plaintiffs extended credit to, and looked for payment from, Sierra. *See Farrell, supra*, at 1350; *Uniroyal, supra*, at 128; *Alcoa, supra*, at 845.

Since there is no basis upon which plaintiffs can properly recover the monies that Dresser paid Sierra, there is no need to consider Dresser's equitable estoppel argument.

Accordingly, I conclude that Dresser is not liable to plaintiffs for the ocean freight and stevedoring services already paid by

Dresser to Sierra. The clerk shall prepare judgment in favor of defendants and against plaintiffs, assessing costs against plaintiffs.