STRACHAN SHIPPING CO., et al.,
Plaintiffs-Appellants,

v.

DRESSER INDUSTRIES, INC. et al.,
Defendants-Appellees.

No. 82–3098.

United States Court of Appeals,
Fifth Circuit.

March 28, 1983.

484

Burke & Mayer, James O.M. Womack, New Orleans, La., for plaintiffs-appellants.

Marc J. Fink, David F. Smith, Washington, D.C., for amicus curiae, U.S. Atlantic & Gulf/Australia-New Zealand Conference.

Lemle, Kelleher, Kohlmeyer & Matthews, Charles Kohlmeyer, Jr., New Orleans, La., for defendants-appellees.

Before CLARK, Chief Judge, THORNBERRY and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

This case involves a suit to recover carriage and stevedoring costs. Four shipping lines (the carriers) and Strachan (the carriers' agent) sued Dresser (the shipper). Dresser denied liability claiming that the plaintiffs had been paid in full since Dresser had paid Sierra (the forwarder), who had since gone bankrupt. The district court ruled for defendant. 534 F.Supp. 205 (E.D. La.1982). We reverse.

## THE FACTS

Dresser shipped cargo on plaintiff carriers' vessels on five occasions between October 24, 1978 and January 19, 1979. The procedure employed was for Dresser to pre-

pare an export order blank. Dresser then contacted Sierra, who booked space on available vessels. Sierra prepared bills of lading and other required export documents. Strachan, as agent for the carriers, signed the bill of lading once the vessel had sailed. The negotiable original of each of bill of lading would be marked "Freight Prepaid" by Strachan and delivered to Dresser through Sierra. A non-negotiable copy of the bill of lading would be stamped "freight due bill." This due bill provided for payment within fifteen days and was delivered to Sierra. Sierra then prepared its own invoice and billed Dresser, retaining the due bill. Dresser paid Sierra, who in turn was supposed to pay Strachan. In this case, however, Sierra received the funds from Dresser but never paid Strachan. Strachan initially directed its collection efforts to Sierra. It was not until April 17, 1979 that Strachan attempted to collect from Dresser, who refused to pay.

Dresser paid Sierra $15 for its services in preparing each shipment. The carriers paid Sierra on a commission basis, ranging from 1.25 to 2.5 percent of the total freight charges.

### THE LAW

The plaintiffs asserted two theories of liability in the lower court. The first theory relied on the language of a conference credit agreement. The second theory was grounded on the agency principle that an agent's failure to remit funds to a third party does not relieve the principal of his obligation to pay. The district court rejected both these arguments. We examine each argument separately.

A. *The Conference Credit Agreement*

Carriers are authorized by statute to form conferences. 46 U.S.C. § 813a. These conferences perform a variety of functions for their carrier members, including the setting of rates. Each conference is typically limited to a specific geographic area or route. *See generally* S.Rep. No.

860, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Ad.News 3108. A shipper signs a "loyalty contract" with the conference in which he agrees to ship exclusively on conference vessels in exchange for reduced freight rates.

Besides the loyalty contract, the conference also provides credit agreements. The general purpose of a conference credit agreement is to provide for the release of bill of ladings marked prepaid prior to the receipt of payment by the carrier. The release of the bill of lading is, in essence, an extension of credit by the carrier to the shipper. The shipper agrees to pay within a certain period of time after the vessel sails.

In this case, one of the carriers, the Bank and Savill Line ("Bank Line"), is a member of the U.S. Atlantic & Gulf/Australia-New Zealand Conference.[1] Dresser signed both the loyalty contract and the conference credit agreement. The conference credit agreement provides:

In consideration of the extension of credit through the issuance and release of bills of lading indicating that freight is payable on other than a freight collect basis by members of the U.S. Atlantic & Gulf/Australia-New Zealand Conference to us directly through our forwarder or agent we hereby agree as follows:

1. To pay to the carrier, or his agents, either directly or through our forwarder or agents, within fifteen working days, excluding Saturdays, Sundays and legal holidays, after the date of the sailing of the vessel from port of loading all freights and charges due on such bill of lading.

2. We will be absolutely and unconditionally responsible to see that all freights and charges due are paid within the fifteen (15) day period, and guarantee that they will be paid to the carrier or his agent regardless of whether or not funds for such payment have been advanced to our forwarder/agent or otherwise.

---

**1.** This discussion and theory of liability relates only to the claims between Bank Line and Dresser. The other carriers cannot take advantage of this agreement since they were not members of the conference.

3. Credit privileges hereunder shall be immediately suspended for any failure to comply with the provisions of this agreement.

Appellant Bank Line takes a plain meaning approach to this agreement. It argues that the language of paragraph 2 is absolutely clear, and that Dresser specifically guaranteed payment even if the forwarder (Sierra here) failed to remit the funds to the carrier.

Appellee Dresser, however, takes a "general intent of the document" approach. It argues that the agreement deals only with the extension of credit and was not intended to allocate the risk of a forwarder's insolvency on any particular party. As evidence of this, Dresser relies on the introductory section indicating that the agreement deals with the extension of credit. Dresser also asserts that the third paragraph provides conclusive evidence of this intent. Dresser contends that paragraph 3 defines the remedy and is specifically limited to the suspension of credit privileges but does not extend to double payment of freight charges.

The district court was convinced by appellee's arguments. The court below relied heavily on *Koninklijke Nedlloyd BV v. Uniroyal, Inc.,* 433 F.Supp. 121 (S.D.N.Y.1977), a case construing an almost identical conference credit agreement. The court there ruled for the shipper, stating:

It must be remembered that the parties were bargaining for credit privileges and not over who would ultimately be responsible for payment .... The guaranty given was not that the shipper would in all events make good any default by the forwarder, but only that payment would be made within the agreed upon credit period. It is the timing of the payments which is at the heart of this agreement.

*Id.* at 126.

■ We first note that contract interpretation is a question of law and the clearly erroneous standard does not apply. *Thornton v. Bean Contracting Co.,* 592 F.2d 1287 (5th Cir.1979). We think the district court erred in its interpretation of this agreement. Both the lower court and the *Uniroyal* court gave this agreement an unduly narrow interpretation. The language of the agreement is clear and unambiguous:

We will be absolutely and unconditionally responsible to see that all freights and charges due are paid within the fifteen (15) day period, *and* guarantee that they will be paid to the carrier or his agent regardless of whether or not funds for such payment have been advanced to our forwarder/agent or otherwise.

As we read this clause, Dresser agreed to pay promptly *and* it agreed to pay the carrier even though funds had been advanced to *its* forwarder. In regard to the third paragraph, we do not think it was intended to obliterate the guaranty language in the preceding paragraph, nor do we think that it was intended to limit the carrier's remedies to only the suspension of credit.[2] We hold that under the conference credit agreement, Dresser agreed to be absolutely liable for the forwarder's failure to remit funds earmarked for the carrier.

### B. *The Forwarder: Whose Agent?*

Despite our construction of the credit agreement, Dresser could escape liability if it could prove that Sierra acted as the carriers' agent. Payment by Dresser to an agent of the carrier would satisfy Dresser's obligation under the credit agreement. If Sierra was the carriers' agent for purposes of collection, Dresser would be relieved from liability to the other carriers not members of the conference, since Dresser would not be responsible for their agent's failure to remit the funds.

■ The district court held simply: "I find that in this case the facts establish that Sierra was plaintiffs' agent for receiving payment." 534 F.Supp. at 208. Ordinarily,

---

**2.** If we accepted appellee's arguments, for the carrier to have retained the protection of the guarantee, paragraph 3 would have to include language to the effect that "if payment is not made, we reserve our right to sue on the aforementioned guarantee." We will not require such superfluous language.

a finding of agency is a question of fact that will not be disturbed on appeal unless clearly erroneous. *Wood v. Holiday Inns, Inc.,* 508 F.2d 167 (5th Cir.1975) (applying Alabama law); *Bartlett-Collins Co. v. Surinam Navigation Co.,* 381 F.2d 546 (10th Cir.1967). However, in a case submitted on stipulations and depositions, as this one was, in which no credibility choices are made by the district court, "the burden of proving the district court's findings clearly erroneous 'is to some extent ameliorated.'" *Onaway Transportation Co. v. Offshore Tugs, Inc.,* 695 F.2d 197, 200 (5th Cir.1983), *quoting Stevens v. East-West Towing Co.,* 649 F.2d 1104, 1106 (5th Cir.1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982). In addition we note that the district court cited no specific facts to buttress the agency conclusion.[3]

■ We conclude that the district court's finding of agency is clearly erroneous. In examining the transaction involved, it becomes clear that the forwarder is an independent contractor who performs services beneficial to both shipper and carrier. This conclusion is in harmony with not only the majority of the case law, but the legislative and administrative history of the statute licensing freight forwarders and permitting carriers to pay commissions to forwarders. 46 U.S.C. § 841b.

Dresser points to two facts showing that Sierra was the carriers' agent. First, that the amount of compensation paid by the carriers far exceeds the relatively nominal fee Dresser paid. Second, that Sierra prepared the bill of lading which is statutorily the carriers' duty. 46 U.S.C. § 193.

While these facts are certainly relevant to the agency determination, they are not determinative. With regard to the fees

paid by the carrier, the legislative history of the bill permitting such payments clearly recognized that forwarders' services benefitted both shipper and carrier. The Federal Maritime Board investigated the forwarding industry and issued rules regulating forwarders. Freight Forwarder Investigation, 6 F.M.C. 327 (1961). The Board found that the functions performed by the forwarder were almost exclusively on behalf of the shipper, and that the payments by the carriers constituted rebates prohibited by the Shipping Act. The Board accordingly prohibited carriers from paying commissions to forwarders. Congress, in response to the outcries of the carriers, forwarders and shippers, passed 46 U.S.C. § 841b. It provides that if a licensed forwarder has arranged the booking of cargo and performed certain other services, including the preparation of; (1) bills of lading, (2) dock receipts, or (3) consular documents, then the carrier may compensate the forwarder. Thus, the Act is an express recognition of the fact that the forwarder performs services beneficial to the carrier. Yet the legislative history of the Act indicates that Congress recognized the dual nature of the forwarder. The Senate Report states:

> ... undoubtedly export shippers benefit from, and many could hardly continue in foreign commerce without, the operations of the independent ocean freight forwarders ...

S.Rep. No. 691, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Ad.News 2699, 2704.[4] The fact that this payment is authorized is therefore not determinative of the agency issue.

With regard to the preparation of the bill of lading, we agree that this does indicate that the forwarder performs services for

---

**3.** We note that after finding that Sierra was the carriers' agent, the district court construed the transaction in question as an extension of credit by the carriers to Sierra. However, if Sierra were the carrier's agent, then the credit nature of the transaction never arises because Dresser has paid the carriers themselves.

**4.** The carriers testified that were it not for the forwarders, certain functions, traditionally

thought to be the responsibility of the shipper, such as getting the cargo to the pier and preparing export documents, would devolve upon the carriers because of the nature of the industry and the inexperience and inability of shippers to be familiar with the myriad procedures at a variety of ports. This testimony supports our view that the forwarders' services benefits both carrier and shipper.

the carrier.[5] Yet this service also directly benefits the shipper. The bill of lading, particularly a negotiable one, is a vital component in today's business world. It represents title to the goods, and the carrier must release the goods to the party entitled to them under the bill of lading. U.C.C. § 7–403. Conversely, the shipper may not obtain the goods at their destination without the bill of lading. The importance of the bill of lading to the shipper is also shown by their use in financial transactions involving letters of credits. The letter of credit is an increasingly utilized device to secure payment. Joseph, Letters of Credit: The Developing Concepts and Financing Functions, 94 Banking L.J. 816 (1977); White & Summers, Uniform Commercial Code, § 18–1 (1980). Typically, the seller (*i.e.* shipper) agrees to ship the goods to buyer. The seller secures payment by having the buyer's bank draw an irrevocable letter of credit which provides that upon presentation of the proper documentation, payment will be made. The bill of lading is invariably one of the documents necessary for payment.[6] The forwarder's function in preparing a bill of lading not only benefits the carrier, but provides vital services to the shipper. To hold otherwise would be to ignore economic reality.

■ Appellees argue that Sierra was Dresser's agent. They point to the fact that Dresser selected Sierra. They also assert that the pre-sailing functions performed by Sierra were performed on behalf of Dresser, and that Sierra is therefore Dresser's agent.

In regard to Dresser's selection of Sierra, obviously this is an indication that Sierra's actions can be attributed to Dresser. Control of the manner in which the forwarder performs his duties, however, rather than selection has been the more important factor in deciding the agency question. *Farrell Lines, Inc. v. Titan Industrial Corp.,* 306 F.Supp. 1348 (S.D.N.Y.), *affirmed,* 419 F.2d 835 (2d Cir.1969), *cert. denied,* 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970); *Uniroyal,* 433 F.Supp. at 128. It is undisputed that Dresser did not control Sierra's actions in booking cargo. Sierra was free to select the carrier or line on which to ship the goods.[7] Deposition testimony also shows that Dresser had little knowledge of the manner in which Sierra performed its duties, much less controlled Sierra's performance.

In regard to Sierra's performance of pre-sailing functions, we agree that many of these activities benefit most directly the shipper, but these activities also indirectly benefit carriers. That view is consistent with Congress' determination of this issue in 46 U.S.C. § 841b. As indicated previously, by the authorization of payments by carriers to forwarders for certain services, including many pre-sailing functions, Congress must have found that these services benefited carriers as well as shippers.

■ If Sierra is neither the shipper's nor the carrier's agent throughout, instead of making the left hand the agent of one and the right hand the agent of the other we view Sierra as an independent contractor. This conclusion is most consistent with the unique position occupied by the forwarder in the shipping industry. While the for-

5. We note, however, that preparing *copies* of the bill of lading may not be the carrier's duty. *See Freight Forwarder Investigation,* 6 F.M.C. at 348 ("for the use *of the shipper* a number of copies of the bill of lading are required . . . that the bills of lading are prepared at the request of the shipper . . ., and that in no instance are the forwarders employed by the carriers to perform this function").

6. A variation of this transaction, is the sight draft or documentary sale. There, the seller will present a sight draft drawn on buyer's account. The bank will honor the draft only upon the presentation of accompanying docu-

ments, including the bill of lading. The major difference in this transaction is that the seller must rely on the buyer's solvency, whereas in a letter of credit, the seller relies on the bank's solvency, normally a less risky proposition.

7. Deposition testimony by Dresser's Traffic Manager indicated that occasionally Dresser would book the cargo directly. Yet the witness indicated that when Dresser did so, the booking was subject to confirmation by the forwarder. This shows the substantial independence enjoyed by Sierra.

warder performs a variety of functions benefiting both shipper and carrier, neither the shipper nor the carrier retains any substantial control over the forwarder's performance. We hold that the forwarder is an independent contractor. *Accord Farrell Lines,* 306 F.Supp. at 1350. ("[W]e find that the forwarder was neither the carrier's agent for receipt of payment, nor the shipper's agent in transactions with the carrier, but rather an independent contractor").

Since Sierra was not the carriers' agent, Dresser is liable to Bank Line under the conference credit agreement. Sierra clearly acted as Dresser's freight forwarder. Under the terms of the agreement, the forwarder, even if an independent contractor, is tied to the shipper. Dresser guaranteed to pay even if the forwarder failed to remit the funds, and we cannot alter this obligation.

C. *Was Dresser Released From Liability?*

Having concluded that Sierra is an independent contractor does not decide the issue of liability. The lower courts that have addressed this issue have asked whether the carrier extended credit to the forwarder. *Farrell,* 306 F.Supp. at 1350; *Naviera Mercante S.A. v. Northrup King Co.,* 491 F.Supp. 508, 510 (S.D.Tex.1980). We think the question is not whether the carrier extended credit to the forwarder, but whether the carriers intended to release Dresser from its obligation and look solely to the forwarder for payment.

The district court held that the carriers extended credit to the forwarder and that Dresser was thereby relieved of its obligation to pay. The court did not, however, discuss whether the extension of credit to Sierra was intended to release Dresser. This issue necessarily depends upon the course of dealing of the particular parties, and must be judged from the totality of the circumstances. We hold that the carriers did not release Dresser from liability.

The fact most strongly indicating that Dresser was relieved of liability is that Strachan initially directed its collection efforts to Sierra. This fact is not conclusive, however, in light of the forwarder's position in the shipping industry. Shippers traditionally give forwarders the power to choose which line to ship cargo on. Carriers are understandably reluctant to alienate forwarders by going behind their backs and contacting the shipper directly.

We think the release of the prepaid bill of lading to Sierra in exchange for the freight due bill also indicates that Strachan did not intend to relieve Dresser of its obligation. Admittedly, Dresser never received the due bill and Sierra was the party who signed it.[8] Sierra, however, signed as "forwarder and agent for the shipper" on a form provided by Strachan. While this form does not prove that Sierra was Dresser's agent, it is strong indication of Strachan's intent to look to Dresser for payment.

One reason the lower courts have relieved shippers of liability is that carriers preferred dealing with forwarders. As the court in *Farrell Lines* put it:

> The carrier could have billed the shipper directly. Instead, for its own convenience, it chose to extend credit to the forwarder. The carrier derived many benefits from this arrangement. Since shippers do not have forwarders' expertise in ocean freight, the carrier, by dealing solely with forwarders, is relieved of many of the burdensome details which unknowing shippers would thrust upon it. The carrier is also relieved from checking the credit ratings of an almost infinite number of shippers and, instead, can rely on the credit of a limited number of forwarders.

306 F.Supp. at 1351 (footnotes omitted). The court's statement that the carrier "could have billed the shipper directly" misperceives the basic nature of the transac-

**8.** A fact looked to in deciding whether the carrier extended credit to the forwarder has been that the shipper was ignorant of the exchange of the due bill for the prepaid bill of lading. *Farrell,* 306 F.Supp. at 1350. Here, the record discloses that Dresser knew of the procedures followed and assumed that Sierra did not prepay the freight charges, but waited to remit Dresser's payment to the carrier.

tion. The carrier would not release a pre-paid bill of lading without an immediate acknowledgement of liability. Since the shipper is frequently not located in the port of shipment, there would be no release of the bill of lading without a substantial delay for the shipper to sign the due bill and return it. To bill the shipper directly is not feasible.[9] Furthermore, the carrier is not the only party who benefits from this arrangement. The shipper secures the prompt release of the bill of lading. He is also relieved of many of the "burdensome details" which he might have to take care of. In regard to credit ratings, we note that the record does not indicate that Strachan relied on Sierra's credit rating. There is testimony, however, that although no formal system was set up, approval by one of Strachan's vice presidents was required if a new shipper were involved. This fact indicates that the carriers looked to the shipper for payment.

Strachan's accounting procedures also indicate that Dresser remained liable for the freight charges. Strachan used copies of the bills of lading rather than an accounts receivable ledger. Sierra was listed as "Forwarding Agent" and signed as agent for the shipper. These bills of lading show no intent to release Dresser in favor of Sierra.

Additional facts in the record support our conclusion. If a shipper did not pay in the required fifteen day period, then Strachan would report that fact to the Conference, who would then circulate a delinquent list. This list contained Dresser's name, not Sierra's. Yet if the carrier were releasing Dresser and relying solely on Sierra, then logically Sierra's name should be on the delinquent list. Also, if the carrier were

extending credit to forwarders, then it follows that they would require forwarders to sign credit agreements. Yet these agreements are required of shippers, not forwarders.

Correspondence between Strachan and Sierra also indicates that Strachan did not release Dresser. Strachan in an attempt to collect, sent letters to Sierra. In this correspondence, Strachan threatened to report the *shipper* as delinquent. In a letter dated November 2, 1978 Strachan also stated that if payment was not forthcoming, it would "Contact the shippers direct for payment." [10]

Lastly, we think that our result comports with economic reality. A freight forwarder provides a service. He sells his expertise and experience in booking and preparing cargo for shipment. He depends upon the fees paid by both shipper and carrier. He has few assets, and he books amounts of cargo far exceeding his net worth. Carriers must expect payment will come from the shipper, although it may pass through the forwarder's hands. While the carrier may extend credit to the forwarder, there is no economically rational motive for the carrier to release the shipper. The more parties that are liable, the greater the assurance for the carrier that he will be paid.

Since the carriers did not release Dresser, Dresser remained liable for the charges incurred by plaintiffs. Dresser protests that we are requiring double payment. While this appears inequitable, it must be remembered that the carriers have not been paid. Dresser selected Sierra and chose to have it remit payment to the carriers. The carriers did not solicit Sierra's participation in this transaction.

The judgment is REVERSED.

9. We also note, that as a matter of commercial practice, to bill the shipper directly does not seem logical. Sierra is the point of contact for Dresser and Strachan. Delivery of the due bill to Sierra is reasonable since Sierra was acting for a disclosed third party. This practice is not inconsistent with relying on that third party for payment.

10. Another indication that Strachan was not extending credit solely to Sierra is its unloading

bill. They list Dresser first as shipper, and then Sierra as *broker*. A broker is normally thought of as "an agent employed to make bargains and contracts for a compensation." Black's Law Dictionary 174 (Rev. 5th ed. 1979); see *Freight Forwarder Investigation*, 6 F.M.C. at 346. This does not make Sierra actually Dresser's agent. One does not, however, normally extend credit to the agent instead of the principal.