953 F.2d 638
 1992 A.M.C. 1025, 21 Fed.R.Serv.3d 1161
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Charles A. PEARSON; Sun Alliance; London Insurance,
P.L.C., Plaintiffs-Appellants,
v.
LEIF HOEGH & COMPANY, A/S, in personam, Defendant-Appellee,
and
Black King Shipping Company, Limited, Defendant.
 No. 91-1620.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 6, 1991.
Decided Jan. 16, 1992.
As Amended March 2, 1992.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk, No. CA-90-1416-N, John A. MacKenzie, Senior District Judge.
 Argued: Richard V. Singleton, II, Healy & Baillie, New York City, for appellants.
 D. Arthur Kelsey, Hunton & Williams, Norfolk, Va., for appellee.
 On Brief: Andrew V. Buchsbaum, Healy & Baillie, New York City, for appellants; A. Jackson Timms, Hunton & Williams, Norfolk, Va., for appellee.
 E.D.Va., 769 F.Supp. 940.
 AFFIRMED.
 Before ERVIN, Chief Judge, and DONALD RUSSELL and WILKINSON, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 After paying yacht-owner Charles A. Pearson the proceeds of a cargo insurance policy which Pearson purchased to insure a yacht against damage during transport from New Orleans, Louisiana to Colombo, Sri Lanka, the insurers, Appellant Sun Alliance and London Insurance PLC, filed this action, asserting a subrogated claim against the freight carrier, Leif Hoegh and Company, for the sum paid to Pearson under their policies for the loss of the yacht in transit. Leif Hoegh sought by way of an affirmative defense limitation of its liability to $500 under the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(5) (1988). Both parties moved for summary judgment as to the affirmative defense. The Magistrate Judge recommended granting the defendant Leif Hoegh's motion for summary judgment, finding that Ardell Yacht and Ship Brokers, which brokered the sale of the yacht to Pearson, was the shipper, that ABIS Forwarding, Inc., which Ardell Yacht and Ship Brokers engaged as the freight forwarder on carriage of the yacht, was the shipper's agent, and that "[w]hatever knowledge the agent had was imputed to the shipper." (J.A. at 870.) The district court adopted the Magistrate Judge's Report and Recommendation. Plaintiff Sun Alliance and London Insurance PLC appealed. Finding no error in the district court's decision, we affirm.
 
 I.
 
 2
 Brian Coleman, a yacht broker associated with Ardell Yacht and Ship Brokers ("Ardell") of Ft. Lauderdale, Florida brokered the sale of the motor yacht "DEVELOPMENT" to Charles A. Pearson on March 23, 1989. After improvements to the yacht were completed, Pearson planned to ship the DEVELOPMENT by ocean-going vessel to the Maldive Islands. Pearson therefore retained Coleman to arrange the desired shipping. Coleman, in turn, engaged Anne Becker, owner of ABIS Forwarding, Inc., ("ABIS") in Miami, Florida to act as the freight forwarder on the shipment of the DEVELOPMENT.
 
 
 3
 Becker stated by affidavit that, as forwarder, she had "principal responsibility to secure the booking and bill of lading for the transport of the yacht from New Orleans to Sri Lanka," and that Ardell "served as shipbroker and shipper of the yacht" for Pearson. (J.A. at 249.) Becker also testified by deposition that she was "the forwarding agent for the shipper." (J.A. at 514.) Coleman communicated to Becker that she should "shop for the lowest possible freight," (J.A. at 518) and informed Becker that someone other than Becker would obtain insurance for any damage occurring to the yacht during shipment. Becker did not expressly offer Coleman an ad valorem option to increase the carrier's liability for cargo beyond the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(5) $500 limit* because, she testified, the offer would have been "futile" due to Coleman's insistence that the ocean freight be "as economical as possible." (J.A. at 634.) Becker further stated, "I understand that the yacht owner secured cargo insurance to protect against the risk of loss while the yacht was being transported to Sri Lanka." (J.A. at 250.) Pearson, in fact, obtained such cargo insurance for shipment of the DEVELOPMENT from the Appellant Sun Alliance and London Insurance PLC ("Sun Alliance"). (J.A. at 253.) As to ABIS' expertise in the shipping industry, Becker testified by deposition that she had operated the freight forwarding business for eleven years, that she typically forwards "[a] couple of hundred boats a year," and that she was aware that the $500 COGSA limitation "was standard in the shipping industry." (J.A. at 512, 633.)
 
 
 4
 Becker ultimately booked the shipment through lines operated by the defendant Leif Hoegh and Company ("Hoegh"). Becker prepared a dock receipt which identified "ABIS forwarding as agents for Ardell Yachts," (J.A. at 519) and executed a United States Customs export declaration under oath which identified ABIS as the shipper's "forwarding agent." (J.A. at 635). Becker also testified that she contacted Hoegh on the shipper Ardell's behalf, that Hoegh did not "in any way" supervise her work, or lead her to believe that she was "in any way" serving "as agent for Hoegh." (J.A. at 637.)
 
 
 5
 Because Becker and ABIS did not possess a copy of Hoegh's usual form bill of lading at the time of shipping, Becker provided the information necessary for the shipment of the DEVELOPMENT on an obsolete Hellenic Lines bill of lading form. Becker forwarded the completed Hellenic Lines bill of lading form to Hoegh's New Orleans, Louisiana agent. As Becker subsequently explained in a fax to Hoegh, ABIS "did not have any of your masters so we used this obsolete master B/L." (J.A. at 224.) The reverse side of the Hellenic Lines form stated, "This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of any country where applicable. All the provisions of such Act are incorporated herein...." (J.A. at 234.) Hoegh's agent then transferred the information provided by Becker on the old Hellenic Lines form to Hoegh's usual bill of lading form. This bill of lading, dated May 7, 1989, called for carriage of the DEVELOPMENT to Colombo, Sri Lanka, where the DEVELOPMENT was to "be discharged on to the water." (E.g., J.A. at 42-44.) The bill of lading contained a box on its face captioned "Export references (6)," wherein was typed, "INSURED UNDER (B) 11814 SUN ALLIANCE INS GROUP." Id. In another box captioned, "Freight Rating and Charges (see clauses 11 and 12)" was entered "1 PC $58,000 LS 58,000.00." Id. Below this captioned box was another stating, "Declared Value Charges (see Clause 12)" where there appeared no entry. Id. On the reverse side of the bill of lading were printed, inter alia, the following clauses:
 
 
 6
 2. PARAMOUNT CLAUSE ...
 
 
 7
 ....
 
 
 8
 B. U.S. Clause Paramount.
 
 
 9
 If the goods are shipped to or from a port in the United States, this Bill of Lading shall have effect subject to the provisions of the US Carriage of Goods by Sea Act ["COGSA"], approved April 16, 1936, which shall be deemed to be incorporated [sic] herein.
 
 
 10
 ....
 
 12. PACKAGE LIMITATION
 
 11
 Where containers have been stuffed by the Shippers or on his behalf, Carrier's liability will be limited to the amount set forth in applicable rules, regulations and law according to Clause Paramount hereof with respect to each container, except where the Shipper declares Ad Valorem valuation on the face hereof and pays additional freight on such declared valuation....
 
 
 12
 For goods received break bulk Carrier's limitation as aforesaid shall be applied per carton, bundle, skid, pallet or other unit as the case may be unless the Shipper declares Ad Valorem value herein and pays additional freight etc. as above.
 
 
 13
 Id. Ardell did not declare an Ad Valorem value pursuant to the Clause 12 Package Limitation, and did not pay the additional freight required to accompany such a declared Ad Valorem valuation. (J.A. at 225, 253, 260.)
 
 
 14
 The tariff which Hoegh filed with the Federal Maritime Commission, which incorporated by reference the Hoegh bill of lading form, further stated,
 
 Rule 12--AD VALOREM
 
 15
 A. The liability of the Carrier as to the value of shipments at the rates herein provided shall be determined in accordance with the clauses of the carrier's regular Bill of Lading form.
 
 
 16
 B. If the shipper desires to be covered for a valuation in excess of that allowed by the Carrier's regular Bill of Lading form, the Shipper must so stipulate in the Carrier's Bill of Lading covering such shipments and such additional liability only will be assumed by the Carrier at the request of the Shipper and upon payment of an additional charge based on the total declared valuation in addition to the stipulated rates applying to the commodities shipped as specified herein.
 
 
 17
 (J.A. at 244.)
 
 
 18
 From Pearson, ABIS received a standard payment of $250.00 for preparing the bill of lading and for other forwarding services involved in the water delivery of a yacht. From Hoegh, ABIS received a payment of $1,450.00, representing ABIS' commission on the freight rate which Hoegh charged Pearson for shipment of the yacht. ABIS received no compensation on the shipment of the DEVELOPMENT other than the $250 from Pearson and the $1,450 from Hoegh. (J.A. at 552-53.)
 
 
 19
 After Ardell's surveyor, Arthur H. Terry and Company, shrink-wrapped the DEVELOPMENT, the yacht was loaded on to the deck of Hoegh's cargo ship, and subsequently arrived in Colombo, Sri Lanka on June 24, 1989. During unloading, stevedores employed by the Sri Lankan Port Authority dropped the DEVELOPMENT from the cargo ship's boom, causing the yacht to strike the ship's rail and sink into the water. Surveyors subsequently declared the DEVELOPMENT a constructive total loss as a result of the mishap.
 
 II.
 
 20
 Appellant Sun Alliance first contends the district court erred in adopting the Magistrate Judge's determination that Appellee Hoegh's bill of lading gave the shipper Ardell fair opportunity to declare a higher value for the yacht by putting Ardell on notice that failure to declare and pay for a higher value would limit Hoegh's liability for damage to the yacht to $500, per COGSA, 46 U.S.C. § 1304(5). With regard to fair opportunity in the context of COGSA, the Fourth Circuit has stated,
 
 
 21
 In determining whether the bill of lading provided [the] insured with adequate notice of the $500 limitation ... the carrier[ ] bears the initial burden of proving fair opportunity. Prima facie evidence of fair opportunity is established, however, if the language of the bill of lading advises the shipper that it may avoid the liability limit by declaring a higher value. The burden then shifts to the shipper to demonstrate that fair opportunity did not in fact exist.
 
 
 22
 Aetna Ins. Co. v. M/V Lash Italia, 858 F.2d 190, 193 (4th Cir.1988) (citing General Elec. Co. v. M/V Nedlloyd, 817 F.2d 1022, 1029 (2d Cir.1987)). In M/V Lash Italia, the bill of lading contained a provision stating,
 
 
 23
 In case of any loss ... exceeding in actual value $500 ... per customary freight unit, the value of the goods shall be deemed to be $500 ... per customary freight unit on which basis the freight is adjusted and the carrier's liability if any in any capacity shall be determined on a value of $500 ... per customary freight unit unless the nature of the goods and evaluation higher than $500 shall have been declared in writing by the shipper upon delivery to the carrier and inserted in this bill and extra value paid....
 
 
 24
 858 F.2d at 194 n. 4. "Moreover, the applicable tariff on file with the Federal Maritime Commission gave notice by stating that '[i]f the shipper desires to be covered for a valuation in excess of that allowed by the ocean carrier's through ... bill of lading form, the shipper must so stipulate....' " 858 F.2d at 194. The court in M/V Lash Italia therefore determined,
 
 
 25
 Because the tariff and the bill of lading both explain the opportunity to declare a higher value and because the [shipper] had prior shipping experience, we agree that Aetna failed to sustain its burden [of showing] that a fair opportunity to declare value did not in fact exist.
 
 
 26
 Here, both the obsolete Hellenic Lines bill of lading form and the paramount clause of the actual Hoegh bill of lading contained express incorporations by reference of COGSA provisions, including 46 U.S.C. § 1304(5). In addition, both the package limitation section of the Hoegh bill of lading and the tariff which Hoegh filed with the Federal Maritime Commission included express conditions for avoiding COGSA liability limitations. We fail to discern any effective difference in the notice given by the bill of lading and tariff in M/V Lash Italia, 858 F.2d at 193, 194 n. 4, and the notice given by the Hellenic Lines bill of lading form, the Hoegh bill of lading and the Federal Maritime Tariff at issue here. Indeed, Appellant Sun Alliance concedes that the only colorable difference between the shipping documents in M/V Lash Italia, 858 F.2d 190, and the Hellenic Lines bill of lading form, the Hoegh bill of lading and the Hoegh Federal Maritime Commission tariff at issue here is that the latter do not specifically list the limitation amount "$500," whereas the documents, for example, in M/V Lash Italia, 858 F.2d at 194 n. 4, state the $500 figure several times. Frankly, we do not find this distinction material. In Cincinnati Milacron, Ltd. v. M/V American Legend, the carrier issued to the shipper a short form bill of lading which, though not actually stating a $500 limitation amount, incorporated by reference both the provisions of COGSA and of a long form bill of lading, each of which, of course, explicitly stated the $500 limitation figure. 784 F.2d 1161, 1162 n. 3-5 (4th Cir.1986). The Fourth Circuit ultimately determined that the short form in Cincinnati Milacron was sufficient to give the shipper notice of the $500 COGSA limitation even though the form did not itself state the $500 limitation amount. 784 F.2d 1161, 1166 (4th Cir.) (Phillips, J., dissenting), aff'd en banc, 804 F.2d 837 (1986). We see no reason, and indeed Appellant Sun Alliance offers none, for a different result here.
 
 
 27
 The court concludes that the Hellenic Lines bill of lading form, the actual Hoegh bill of lading, and the tariff which Hoegh filed with the Federal Maritime Commission sufficiently explained to the shipper Ardell both the $500 COGSA limitation and the opportunity to declare a higher value for the yacht DEVELOPMENT. Prima facie evidence of fair opportunity is thereby established.
 
 
 28
 In order to rule that a fair opportunity to declare a higher value for the yacht existed for the shipper Ardell, the court arguably must also find that Ardell was experienced in the shipping industry. See Aetna Ins. Co. v. M/V Lash Italia, 858 F.2d 190, 194 (4th Cir.1988) (fair opportunity existed where tariff and the bill of lading both explained opportunity to declare a higher value and shipper had prior shipping experience). As Judge Phillips suggested in Cincinnati Milacron, "[I]t may indeed be unfair to hold the newcomer or unsophisticated shipper to the terms of COGSA when they nowhere appear in the shipping documents...." 784 F.2d at 1166 (citing Pan American World Airways v. California Stevedore and Ballast Co., 559 F.2d 1173 (9th Cir.1977)). In this regard, Appellant Sun Alliance contends that Ardell was an inexperienced shipper, and that the expertise which ABIS Forwarding, Inc. possessed in the shipping industry cannot be imputed to Ardell because ABIS was not Ardell's agent, but rather was an independent contractor.
 
 
 29
 The bulk of authority on this issue indicates that the freight forwarder is properly considered the shipper's agent. The Supreme Court has observed of the freight forwarding business,
 
 
 30
 The foreign freight forwarding business is a medium used by almost all export shippers. An exporter, intending to send goods abroad, consigns the merchandise to a forwarder who makes all the arrangements for dispatching it to a foreign port. The forwarder must arrange for the necessary space ... [and] prepare the many documents.... If requested to do so, a forwarder will secure whatever insurance is needed.
 
 
 31
 Forwarders also have many incidental duties. They check marks on shipping papers.... They keep records, for the convenience of the exporter....
 
 
 32
 By engaging in these many activities of the forwarding business, independent forwarders ... act as agents of the shipper.
 
 
 33
 United States v. American Union Transp., 327 U.S. 437, 442-43 (1946) (emphasis added). More recently, the Eleventh Circuit reached the same conclusion. In Insurance Co. of North America v. M/V Ocean Lynx, after deeming the freight forwarder to be the shipper's "agent," the court determined that since the forwarder "maintained multiple copies of the [carrier's] master bill of lading in its files," and since the forwarder "certainly had an opportunity to read those copies of [the carrier's] bill of lading," the shipper was afforded a fair opportunity to avoid COGSA section 1304(5) liability limitations. 901 F.2d 934, 940 (11th Cir.1990), cert. denied, 111 S.Ct. 675 (1991). See also United States v. Ventura, 724 F.2d 305, 311 (2d Cir.1983) (stating that courts describe freight forwarders as "agents of the shipper" for the purposes of arranging cargo transport).
 
 
 34
 Appellant Sun Alliance notes that the Fifth Circuit previously held that the forwarder is not an agent of the shipper, but is rather an "independent contractor who performs services beneficial to both shipper and carrier." Strachan Shipping Co. v. Dresser Indust., Inc., 701 F.2d 483, 487 (5th Cir.1983). In Strachan, the shipper remitted funds to a freight forwarder with the understanding that the forwarder would in turn use such funds to pay the carrier for the carriage of the shipper's cargo. 701 F.2d at 485. However, the forwarder subsequently declared bankruptcy, and never remitted the shipper's funds to the carrier as payment on the carriage. Id. at 487. In ruling that the shipper remained liable to the carrier on payment for carriage of the shipper's goods, the Fifth Circuit relied upon a credit agreement whereby the shipper agreed to "be absolutely ... responsible to see that all freights and charges are paid ... and [to] guarantee that they will be paid to the carrier ... regardless of whether or not funds for such payment have been advanced to [the] forwarder...." 701 F.2d at 485.
 
 
 35
 While not choosing to dispute Appellant's recitation of Strachan, this court notes the case involved the interpretation of a carrier conference credit agreement employed by member carriers, and the determination of a signatory shipper's liability thereunder for non-payment of freight charges by the shipper's forwarder. 701 F.2d at 485. Even if Strachan, 701 F.2d at 485, can be construed to indicate that a freight forwarder is not the shipper's agent in the context of COGSA, we are not inclined to follow such precedent. Simply put, we find Fourth Circuit case law, and other precedent addressing whether the shipper enjoyed a fair opportunity to avoid COGSA limitations, e.g., Insurance Co. of North America v. M/V Ocean Lynx, 901 F.2d at 940, more pertinent to resolution of the instant controversy. And, guided by precedent from our own circuit, we conclude that ABIS acted as the shipper Ardell's agent for arranging shipping for the yacht DEVELOPMENT, and that ABIS' knowledge of the COGSA section 1305(5) $500 liability limitation is properly imputed to Ardell. We therefore affirm the district court's ruling that Appellant Sun Alliance failed to sustain its burden of showing Ardell did not have fair opportunity to avoid the COGSA limitation.
 
 
 36
 Finally, Appellant Sun Alliance contends that the district court abused its discretion in adopting the Magistrate Judge's denial of the Plaintiffs' motion to amend their response to Hoegh's request for admissions. Hoegh served Plaintiffs with various Requests for Admission after the commencement of this action, including the following: "19. ABIS Forwarding, Inc. was serving as an agent of the shipper." (J.A. at 260). Plaintiffs' response on January 4, 1991 stated "19. Admit that ABIS was agent and/or subagent for both Charles A. Pearson [sic] Hoegh Lines." (J.A. at 253.) Sun Alliance contends that Plaintiffs were unable to interview freight forwarder Anne Becker, owner of ABIS, and consequently were unable to obtain access to information required for a correct response until Becker's March 5, 1991 deposition. At the partial summary judgment hearing before the Magistrate Judge two days later, Plaintiffs explained that, after deposing Becker, they became aware that she was an "independent contractor.... If anything, we admitted that she was agent[ ] for both the carrier and for us, and we will certainly be filing an amendment ... saying she was in fact an independent contractor...." (J.A. at 835.) Plaintiffs filed no amendment to Admission 19, but instead sent a letter to the court wherein Plaintiffs stated, "This oral amendment [at the hearing] should be sufficient." (J.A. at 856.) The Magistrate Judge determined, "The request came too late, and the proposed amended response will not be considered." (J.A. at 870).
 
 
 37
 Fed.R.Civ.P. 36 provides,
 
 
 38
 [T]he court may permit withdrawal or amendment [of an admission] when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that the withdrawal or amendment will prejudice that party in maintaining the action....
 
 
 39
 Fed.R.Civ.P. 36(b).
 
 
 40
 Thus, the test for allowing amendment is a two-pronged inquiry asking whether upholding admissions would eliminate any presentation of the merits and whether the party opposing the motion has met its burden of showing prejudice. E.g., Teleprompter of Erie, Inc. v. City of Erie, 567 F.Supp. 1277, 1286-87 (W.D.Pa.1983). No legitimate doubt exists that the Magistrate Judge correctly apprehended the substance of the relationships between Ardell and ABIS, and between ABIS and Hoegh. It is therefore quite unlikely that the Magistrate Judge's denial of the Motion to Amend eliminated any presentation of the merits of the action. Moreover, Hoegh could arguably have been prejudiced by any amendment to Requests For Admission 19 in that Hoegh relied upon the admission made on January 4, 1991 up until the hearing on motion for partial summary judgment on March 7, 1991, and prepared its court documents and oral arguments accordingly. On these facts, the court cannot say that the district court abused its discretion in adopting the Magistrate Judge's denial of Plaintiffs' Motion to Amend their response to Hoegh's Requests for Admission.
 
 
 41
 For the above reasons, the district court's adoption of the Magistrate Judge's findings and recommendation is hereby
 
 
 42
 AFFIRMED.
 
 
 
 *
 Section 1304(5) of COGSA limits the carrier's liability to $500/package or customary freight unit unless the shipper declares a higher value, i.e., the "ad valorem" and pays a correspondingly higher freight rate. See 46 U.S.C. § 1304(5)