**KONINKLIJKE NEDLLOYD BV, Plaintiff,**

v.

**UNIROYAL, INC., Defendant.**

**No. 75 Civ 3730–CLB.**

United States District Court, S. D. New York.

May 27, 1977.

---

Kirlin, Campbell & Keating by J. Scot Provan, New York City, for plaintiff.

Arthur, Dry, & Kalish by David C. Thomas, New York City, for defendant.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

By its complaint filed July 30, 1975, plaintiff Koninklijke Nedlloyd ("Nedlloyd"), an ocean carrier, seeks to recover $2,350.15 in freight charges for the transportation of four shipments of cargo owned by the defendant, Uniroyal, Inc. ("Uniroyal") from New York to various ports in the Persian Gulf. Uniroyal asserts that it paid all sums now claimed by plaintiff to Eastern Cargo Forwarders, Inc. ("Eastern"), an ocean freight forwarder, and that Eastern failed to remit these sums to the plaintiff. Eastern is presently in bankruptcy, and the carrier now seeks to hold the shipper liable for these freight charges.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333. A non-jury trial was held before me on November 16, 1976. Post-trial briefs have been submitted and considered.

*The Parties*

Plaintiff Nedlloyd is a foreign corporation organized under and existing by virtue of the laws of the Kingdom of the Netherlands. It owns and operates ocean-going vessels which are engaged in the carriage of cargo in the foreign commerce of the Unit-

ed States. Plaintiff is a member of the "8900" Lines Conference, which establishes rules, regulations, and rates for its member carriers, all of whom transport cargo from the Port of New York and the other Atlantic and Gulf Coast ports to ports in the Persian Gulf. Nedlloyd Lines, Inc. is plaintiff's general agent in the Port of New York.

Defendant Uniroyal is a corporation organized under the laws of the State of New Jersey and is a major producer of tires and chemicals. During 1973 and 1974, Uniroyal exported approximately 5,000 to 6,000 separate shipments each year from the East and Gulf Coast ports of the United States, and it paid various carriers over $500,000.00 in freight charges each year.

While not a party to the lawsuit, Eastern's activities should be described. It was the freight forwarder employed exclusively by Uniroyal on all outbound shipments from the Port of New York from 1968 until September 1974. Approximately 50 to 60% of Eastern's gross income was derived from services in connection with the Uniroyal account, described below.

*Facts*

Familiarity is assumed with the uncontested facts which have been stipulated to in the Amended Pre-Trial Order, signed November 16, 1976. On June 20, 1967, Uniroyal entered into a "Shipper's Credit Agreement" with the "8900" Lines Conference. This agreement gave member carriers of the Conference such as Nedlloyd permission to extend credit to Uniroyal or its freight forwarder for freight charges for a period of fifteen (15) business days following departure of the carrying vessel. Without such an agreement the freight charges would be payable upon issuance of Nedlloyd's freight invoice (or Due Bill) at the time the Bill of Lading is released.

Unlike many shippers, Uniroyal would book space directly on Nedlloyd's vessels, and would also arrange for all of the inland transportation from plant to pier. These are services which may be performed by a freight forwarder, but Uniroyal's practice was to have its own Traffic Department attend to such matters. However, Uniroyal did contract with Eastern to have the latter prepare all of the documentation, including bills of lading, dock receipts, customs declarations, consular invoices and any necessary banking documents. The Bill of Lading would be drawn up by Eastern from the information supplied by Uniroyal, and would then be carried by Eastern to Nedlloyd's general agent in New York. The agent would check the bill against the cargo lifted by the ship, and the Bill of Lading would then be issued, assigned a serial number and released to Eastern's messenger after he had initialed the Due Bill covering the freight charge.

For its services, Eastern was paid a flat fee per shipment. It billed Uniroyal for this service charge, and for the freight which, as noted, under the terms of the Credit Agreement was due to Nedlloyd fifteen (15) business days after sailing.

Under normal circumstances, in accordance with a custom or practice which developed, Uniroyal did not put Eastern in funds until well after the fifteen (15) days had run. Prior to 1974, Eastern on occasion would advance funds to cover the freight charges, although its general practice was to make a payment to the carriers by its own check only after it had received payment from Uniroyal.

In early 1974 Eastern began to have cash flow problems. It began to delay payments to the carriers well beyond the time when Uniroyal remitted funds. What is more, specific payments no longer corresponded with whether or not Uniroyal had paid a particular Eastern bill, but depended on which carrier was the loudest in its demands for funds.

For example, on March 7, 1974, Nedlloyd carried a shipment of defendant's goods from New York to Bahrain. Nedlloyd apparently was not one of those carriers which complained most vigorously over Eastern's late payments. By late May or early June with this freight invoice still unpaid, Mr. Freeley, the freight cashier

learned from rumor "on the street" that Eastern might be in some financial difficulties. He asked his supervisor for, and apparently received, permission to contact Uniroyal to inform it that Eastern was delinquent. It is not clear that Uniroyal ever actually learned of Eastern's dilatory actions with respect to the March shipment, because soon thereafter, Mr. Freeley suffered a heart attack and was away from work for seven weeks. Eastern finally paid the freight on the March invoice on June 10, 1974, well after the authorized fifteen (15) business day payment period had expired.

The four shipments concerned in this action were made in May, June and July of 1974, substantially in accordance with the procedure outlined above. On May 24th, Nedlloyd issued B/L 0626 covering the carriage of 26 cartons of tubes to Kuwait on board the NEDER EEMS. The freight invoice was $72.13. On June 11th the plaintiff issued and released B/L 5015 and B/L 0529, the former covering 15 truck tires, and the latter 85 other tires with 316 cartons of tubes for shipment aboard the MISSISSIPPI LLOYD to Qatar and Bahrain. The freight invoices issued in connection with the June 11th bills were $72.63 and $1,140.20, respectively. Finally, B/L 0024 dated July 17, 1974 covered the carriage of 58 cartons of batteries on board the MERSEY LLOYD to Abu Dahbi. The freight charge was $1,065.19, making a total for all four shipments of $2,350.15.

On all of the Bills of Lading and freight invoices, Uniroyal was listed as the shipper and Eastern was stated to be the forwarder. However, Eastern was carried in Nedlloyd's accounts receivable records as the payor or debtor on these invoices. Each Bill of Lading contained the legend "Freight to be Prepaid". Because Uniroyal had signed the Shipper's Credit Agreement permitting the carrier to extend credit to the shipper or to the forwarder, Nedlloyd issued and released the Bills of Lading prior to payment, upon condition that these charges be paid within fifteen (15) business days after sailing.

In the summer of 1974 Nedlloyd was experiencing certain personnel problems in its New York office, and the evidence shows that this fifteen (15) business day period was not strictly enforced. In fact, Nedlloyd did not even begin to pester the forwarder about payment until almost 30 days had passed. After about 45 days, the shipper would be contacted in order to put pressure on the forwarder to pay the Due Bill. While the forwarder did not appreciate being embarrassed in front of the shipper, the shippers themselves often resented being contacted about Due Bills they considered the responsibility of the forwarder. Like many other carriers, Nedlloyd's pressuring was done reluctantly, since it did not want to alienate important shippers who could take their business elsewhere.

While there was testimony that Eastern generally billed Uniroyal two days after receiving the Due Bills from Nedlloyd, the documentary evidence shows in contrast that during the summer of 1974 Eastern was notoriously slow in billing Uniroyal for the freight and service charges. In fact, on the first and fourth shipments involved here, Uniroyal did not even receive an invoice from Eastern until the fifteen (15) business day period had expired. While each bill submitted by Eastern was accompanied by a copy of the freight invoice, there was no way for Uniroyal to determine from the face of these documents whether or not Eastern had already remitted funds to cover the freight and other charges listed thereon. In fact, because of Eastern's cash flow problems, it was not making any more advance payments by the time of the transactions in issue.

Once Uniroyal received Eastern's bill, it paid promptly. On July 10, 1974 it issued checks to Eastern in payment of the first three Due Bills involved here. On August 20th it paid the last one. These checks cleared the bank, but Eastern has never paid the proceeds to Nedlloyd.

It was not Uniroyal's practice to supervise either the order or the method of Eastern's payment to the carriers, although when Uniroyal sent Eastern a check, it

would enclose a list showing precisely which freight invoices the payment was intended to cover.

By late August 1974 Uniroyal had received calls from two other carriers complaining that Eastern had failed to pay certain freight charges. Uniroyal then contacted Eastern and was informed (falsely) that the failure to pay was due to a clerical error. Eastern then paid these two carriers. In early September, Uniroyal received yet a third complaint, and this time it initiated an investigation to determine what the problem was. By September 13th, Uniroyal learned that Eastern had failed to pay many other carriers including the plaintiff. On September 16th, the defendant decided to change its policy so that henceforth it would pay the carriers directly. To determine the scope of the problem Uniroyal wrote to some 57 carriers who had transported its goods out of the Port of New York. Three days later Nedlloyd informed the defendant for the first time that Eastern had not paid the freight charges on the May, June and July shipments. After receiving Uniroyal's letter, plaintiff changed its books and records to show Uniroyal as the payor or debtor on these overdue freight charges. Nedlloyd then sought a commitment from Uniroyal that it would pay, but Uniroyal refused to give any such commitment.

One further factor bears on the relationship of the three parties. Under 46 U.S.C. § 841b(e), the carrier is permitted to pay a brokerage commission to the freight forwarder provided that the latter performs at least three of five specified functions in connection with the movement of the cargo. Mr. Leotta, the Vice President of plaintiff's general agent, described this brokerage payment as an archaic survival of past practices. It was particularly anomalous in this case, because Uniroyal itself booked space on the Nedlloyd vessels and Eastern played no role at all in procuring this business for the plaintiff. But, since Eastern certified to the carrier that it performed at least three out of the five specified functions, the brokerage commission was earned and paid to the forwarder. While there

may be some doubt as to whether or not the brokerage is properly payable before the forwarder remits funds to pay the freight, there is testimony here that Nedlloyd's bookkeeping practices in 1974 were somewhat lax and that forwarders like Eastern were being paid even before the carrier received payment for the freight. Uniroyal's freights would not have been lower had it dispensed with use of a forwarding firm.

*Issues*

Nedlloyd asserts that Uniroyal as the shipper remains liable for the freight charges even though it apparently paid the full amount of the freight to Eastern. Plaintiff claims that there are four separate and independent grounds upon which Uniroyal is liable: (1) the Shipper's Credit Agreement, (2) the Bill of Lading, (3) the Shipping Act of 1916, and (4) Principles of Agency. Uniroyal denies that any of these contracts, statutes or common law principles make it liable and claims that in any event Nedlloyd should be equitably estopped from making the defendant pay twice under the peculiar circumstances of this case.

*The Shipper's Credit Agreement*

Under the Shipping Act of 1916, 46 U.S.C. § 817b(1), every ocean carrier and every conference is required to file tariffs with the Federal Maritime Commission ("FMC"), showing the freight rates presently applicable between the ports which it serves. Incorporated into the tariffs on file are the credit terms uniformly available to shippers dealing with the carrier or conference. Paragraph 24 of the tariff in effect for the "8900" Lines Conference in 1974 contained the text of the Shipper's Credit Agreement, which stated in relevant part:

"(d) In consideration of granting credit to us directly or to our duly authorized forwarders by the issuance and release of the bills of lading indicating that ocean freight is payable to any member of The '8900' Lines at United States Atlantic and Gulf Ports served by such Members, we hereby undertake and agree as follows:

\* \* \* \* \* \*

2. We will be absolutely and unconditionally responsible to the Carrier for payment of all freight and charges due within fifteen (15) business days (Saturdays, Sundays, and Holidays excepted) of the sailing of the vessel from the respective port of loading and guarantee that they will be paid within that period, irrespective of whether or not funds for payment have been advanced to the forwarder or otherwise."

When signed by the shipper, this Credit Agreement is on a one-page form letter and is printed on the letterhead of the "8900" Lines. The shipper must sign this contract of adhesion in order to obtain credit privileges for itself or for its forwarder. While it is undisputed that Uniroyal signed such an agreement in 1966, and that it was in effect in 1974, the parties have differing views as to precisely what their rights and obligations were under it.

■ Nedlloyd contends that Uniroyal was absolutely responsible for payment under all circumstances, and that it could look to the shipper in the event that the forwarder defaulted. Yet this is not the most reasonable interpretation of the Agreement. It must be remembered that the parties were bargaining for credit privileges and not over who would ultimately be responsible for payment. The introductory clause uses the language "in consideration of granting credit to us or to our duly authorized forwarders;" and ¶ 2 states that Uniroyal is to be responsible not for payment but for payment within fifteen (15) business days. The guaranty given was not that the shipper would in all events make good any default by the forwarder, but only that payment would be made within the agreed upon credit period. It is the timing of the payments which is at the heart of this Agreement. And the final clause in ¶ 2 shows only that the carrier wanted to be assured of prompt payment, even though the shipper may not have advanced funds to the forwarder in time to meet the deadline. It does not purport to deal with the rights and obligations of the parties, where, as here, the shipper pays the forwarder and

the latter fails to remit funds to the carrier. The plaintiff cannot now seek to transform the Credit Agreement into an absolute undertaking to pay under any and all circumstances.

This interpretation of the Credit Agreement is consistent with the other provisions of the tariff filed with the FMC. Paragraph 24(c) states:

"(c) It shall be the responsibility of each carrier to take prompt measures to collect freight moneys and/or charges unpaid after the fifteen (15) day period specified in this Rule. No further credit shall be extended by any carrier to the shipper and/or forwarder concerned until right to credit is restored. The right to credit shall not be restored until all freight moneys and charges due and owing any carrier by the shipper for a period longer than the fifteen (15) business day period hereinabove provided, shall have been paid."

This section leaves it up to the individual carriers to take prompt measures to collect freight. But there is nothing in either the tariff or the Credit Agreement which tells the carrier from whom it is supposed to collect. (That depends on who the debtor is, and that may be either the shipper itself or the forwarder, according to the specific business arrangements of the three parties involved.)

This narrow interpretation of the Shipper's Credit Agreement also finds support in the testimony of Mr. Leotta, Vice President of plaintiff's General Agent in New York. He stated that if initial efforts to collect from the forwarder are unsuccessful, Nedlloyd will eventually contact the shipper. If the shipper then gives his word that the forwarder will pay, then the matter is usually left there. If he doesn't give his word, then a demand is made upon the shipper to pay directly. Thus Nedlloyd always gets either the commitment of the shipper that he will pay directly or his explicit guaranty of a specific payment to be made by the forwarder. If, as plaintiff claims, the Credit Agreement in and of itself required the carrier to pay where the

forwarder fails to remit funds, then there would be no need to obtain this subsequent oral commitment from the shipper.

Since the Credit Agreement was not designed to deal with the problem of who must ultimately bear the loss in the present situation, Nedlloyd's claim that Uniroyal's signature on that Agreement alone makes it liable for the freight moneys cannot be sustained.

*The Bill of Lading*

■ On the four Bills of Lading involved here, Uniroyal is identified as the shipper and Eastern as the forwarder. The long form Bill of Lading on file with the FMC is the basic contract of carriage and contains all of the terms and conditions covering the transportation of the cargo. Nedlloyd claims that item 12 requires the shipper to pay the freight under the circumstances of this case. That item states in relevant part:

> "In all circumstances the shipper remains responsible for the freight, primage and charges until same have been paid."

Item 12 is not, however, a basis for holding the shipper liable under the circumstances of this case. The section quoted above must be read in context in order to understand that it was designed to deal with the two standard situations for the payment of freight. The first is "prepaid freight," where the charges are payable upon shipment and the second is "collect freight", which must be collected from the consignee of the goods at the port of discharge. Thus the "in all circumstances" phrase refers to the situation where the carrier is unable to collect from the consignee. The shipper as the party contracting with the carrier must then shoulder the responsibility for paying the freight. Item 12 does not address the problem of the defaulting forwarder, the situation which we have here.

*The Shipping Act of 1916*

■ Section 817b(3) of Title 46, United States Code prohibits carriers from charging any greater or less or different rate from the tariff on file with the FMC. It also forbids carriers from granting any rebate, refund or special privilege to any shipper. Plaintiff asserts that this prohibition against special privileges means that the carrier must receive payment for freight charges no matter how inequitable its conduct and despite the fact that a shipper may already have paid the forwarder. To support its position, Nedlloyd cites *Bartlett-Collins Co. v. Surinam Navigation Co.,* 381 F.2d 546 (10th Cir. 1967), and dicta in *Compania Anonima Venezolana de Navagacion v. A. J. Perez Export Co.,* 303 F.2d 692 (5th Cir.), *cert. denied* 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962). But later cases have not followed this absolutist approach. In *Farrell Lines Inc. v. Titan Industrial Group,* 306 F.Supp. 1348 (S.D.N.Y.), *affirmed on opinion below,* 419 F.2d 835 (2d Cir. 1969), *cert. denied* 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970), the shipper paid the forwarder and the forwarder went bankrupt before it remitted funds to the carrier. Judge MacMahon held that the carrier's statutory obligation to collect the full amount of the freight was not intended to impose what amounted to an absolute double liability on the shipper. The purpose of the statute was only to prevent discrimination in freight rates. He continued:

> "As long as someone is liable for the full amount of the freight, so there is no overcharge or undercharge, the public interest is protected and the statutes are satisfied."

*Id.* at 1349. *Cf. Southern Pacific Transportation Co. v. Campbell Soup Co.,* 455 F.2d 1219 (8th Cir. 1972).

The facts in this case are similar to *Farrell Lines, supra.* There was no grant of a rebate or refund, and there was certainly no intention to discriminate. Nor was there present any purpose to grant Uniroyal a special privilege. The cause of the non-payment was Eastern's dilatory conduct and its ultimate bankruptcy. Nedlloyd could have filed a proof of claim in the Bankruptcy Court, but it chose not to do so. And it could have notified the shipper on the sixteenth day. Under such circum-

stances, the Shipping Act does not require the shipper to pay twice.

## Agency Principles

■ Finally, Nedlloyd claims that Eastern was acting as an agent for a disclosed principal, and that Uniroyal is therefore bound by the contracts entered into by the forwarder on its behalf. Since Eastern was the defendant's agent, plaintiff reasons that Uniroyal must be responsible for the failure of its agent to remit the funds. Defendant admits that the forwarder was its agent for certain purposes (preparation of documents, signing of the Bill of Lading, etc.), but claims that Eastern was Nedlloyd's agent for purposes of collection. Thus under Uniroyal's theory payment to the forwarder would satisfy the shipper's obligation to pay the carrier.

The precise status of a forwarder is a matter which is not free from doubt, and it would serve no useful purpose to attempt here to reconcile all of the conflicting cases. In the Court's opinion, the most persuasive reasoning is contained in Judge MacMahon's decision in *Farrell Lines, supra*. He held that a forwarder was an independent contractor, and was thus not an agent of either the shipper or the carrier.

The evidence in this case certainly supports such a holding here. Uniroyal contracted with Eastern for the latter to perform certain services in connection with the former's shipment of goods overseas. Eastern was paid a flat fee to prepare the documents with respect to each shipment. But Eastern was not under the control of Uniroyal, and performed many of the same functions for other shippers. *Cf. Consolidated Freightways Corp. of Delaware v. Admiral Corp.*, 442 F.2d 56, 63 (7th Cir. 1971). Furthermore, the evidence shows that Uniroyal did not supervise Eastern's payments to the carriers. Rather, Uniroyal let the forwarder use its independent business judgment as to who should get paid and when such payments should be made. As for Nedlloyd, the evidence shows that it paid a 2½% brokerage commission to Eastern in connection with each of the four

shipments involved. But Eastern received commission income from many other carriers, and the mere payment of a commission pursuant to a statutory authorization does not establish an agency relationship. What is more, it appears that Eastern could and did earn its commissions, even though the freight charges were never actually paid over to Nedlloyd. This is hardly consistent with the concept that Eastern was Nedlloyd's collection agent.

By the issuance of the Bills of Lading, Nedlloyd and Uniroyal contracted for the carriage of cargo. The evidence is undisputed that the forwarder signed the Due Bills and that the carrier initially looked to the forwarder for the payment of the freight. While Nedlloyd's collection efforts in this case were, to be sure, rather meager, they were aimed exclusively at Eastern, until the time that it received Uniroyal's September 23, 1974 letter.

The only reasonable conclusion is that in issuing the Due Bills over the forwarder's signature, the carrier thereby extended credit to the forwarder. The Shipper's Credit Agreement itself contemplates that credit may be extended to the forwarder on these Due Bills. In addition, as noted, Eastern was carried on Nedlloyd's books as the debtor on the accounts receivable until it became clear that collection from the forwarder was impossible.

Such an interpretation also comports with the business realities. It was more convenient for Nedlloyd to deal with a relatively small number of forwarders located in the port, than with an almost unlimited number of shippers throughout the country, many of whom would have uncertain credit ratings.

Eastern was thus the principal obligor on the freight invoice and was responsible to Nedlloyd for payment. Under the Credit Agreement, Uniroyal guaranteed that such payments would be made within fifteen (15) business days, in return for Nedlloyd's promise to extend credit to Uniroyal or to its duly authorized forwarders. While pursuant to this Agreement Nedlloyd could have dealt directly with Uniroyal, that was

not the way it chose to conduct its business, and it cannot now seek to recast that transaction so as to make Uniroyal primarily liable.

Since there is no basis upon which Nedlloyd can properly recover the freight charges from Uniroyal, there is no need to consider the latter's equitable estoppel argument. However, whether or not Eastern were to be regarded as an agent of Nedlloyd, it had sufficient circumstantial evidence to know that its agent was faithless, and either diverting funds collected from shippers, or failing to collect such finds within the time required by Agreement and tariff. As noted, Uniroyal did not know of Eastern's defalcations until too late.

The foregoing, together with the Stipulated Findings of Fact, incorporated into the Amended Pre-Trial Order of November 16, 1976, constitutes the Findings of Fact and Conclusions of Law, pursuant to Rule 52, F.R.Civ.P.

The Clerk of the Court shall enter judgment for defendant pursuant to Rule 58, F.R.Civ.P. that all relief be denied.