**SEA–LAND SERVICE, INC., Plaintiff,**

v.

**AMSTAR CORPORATION, Defendant.**

**No. 86 Civ. 2990 (WCC).**

United States District Court,
S.D. New York.

July 13, 1988.

Beck, Halberg & Williamson, New York City, for plaintiff; Herbert B. Halberg, of counsel.

Healy & Baillie, New York City, for defendant; Thomas L. Rohrer, of counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiff, Sea–Land Service, Inc., an ocean carrier of goods for hire, is a Delaware Corporation having its principal place of business in Edison, New Jersey. Amstar Corporation, which operates a large sugar refining business and sells refined sugar internationally under the Domino brand name, is also a Delaware Corporation with its principal place of business in New York, New York. Sea–Land brought this action in admiralty against Amstar to

recover freight charges due on shipments of refined sugar.

The Court held a two-day, non-jury trial commencing on February 24, 1988. The parties agreed to submit post-trial memoranda, and they filed their final post-trial submissions on May 20, 1988. The Court has carefully reviewed these memoranda, the stipulated facts, and the testimony and documentary evidence received at trial. This opinion and order incorporates the Court's findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P. For the reasons set forth below, Sea–Land is entitled to judgment in the amount of $89,574.84 plus attorneys' fees, court costs and interest.

## I. FINDINGS OF FACT

This case involves thirty-five cargoes of Amstar sugar which Sea–Land transported from New Orleans, Louisiana, to Amstar's customers in Puerto Rico, Aruba and Curacao (SF. ¶¶ 10–12).[1] The first shipment sailed from New Orleans on September 26, 1984 and the last shipment sailed on December 4, 1984 (SF. ¶ 9).

Sea–Land's freight bills show that Amstar was the shipper of twenty-three of these cargoes, and that Amstar's customers, Montrad Enterprises, Inc., and the Feng Yang Trading Company, were the shippers of the remaining twelve cargoes (Exh. 4). The total charge for the cargoes was $147,351.60, distributed among the three shippers as follows: $89,566.84 for the Amstar shipments; $43,071.18 for the Feng Yang shipments; and $14,713.58 for the Montrad shipments.[2] Amstar had an arrangement with Montrad and Feng Yang, whereby Amstar would pay their freight charges, and later receive reimbursement from them (SF ¶ 11).

Amstar has for a number or years used Erskine Freight Forwarding Company, Inc. as a freight forwarder, and Erskine acted as the freight forwarder in connection with the subject shipments of sugar (SF. ¶ 6). Although Amstar was Erskine's biggest customer in 1984 and 1985, Erskine acted as freight forwarder for at least seven other shippers who shipped goods with Sea–Land (Exhs. M & N). Amstar paid Erskine a fee for Erskine's services in connection with each of the cargoes involved in this case. Sea–Land paid Erskine a fee as well, but only as to shipments to Aruba and Curacao—Sea–Land was not obligated to pay a fee in connection with shipments to Puerto Rico (SF. ¶ 17; Tr. 35, 178).

A course of dealing developed between Amstar, Sea–Land and Erskine. Erskine would book space on Sea–Land vessels on behalf of Amstar, and prepare bills of lading using Sea–Land's bill of lading form (SF. ¶ 7; Tr. 190–91, 198).[3] Sea–Land would forward its freight bills to Erskine, who would then bill Amstar for its forwarding fee and for Sea–Land's freight charges. After Amstar paid Erskine, Erskine was then to forward the payments on to Sea–Land (Tr. 189–91). Sea–Land had attempted to arrange direct billing with Amstar, but Amstar insisted on forwarding its payments through Erskine (Tr. 138).

The dispute in this case arose when Erskine deviated from the course of dealing. Amstar paid Erskine for all thirty-five cargoes, but Erskine never forwarded the payments on to Sea–Land (SF. ¶¶ 13, 14). Erskine thereafter filed for bankruptcy.

All shipments involved in this action were shipped under Sea–land bills of lading (SF. 9; exh. 2), which contained the following clause:

13. FREIGHT LIENS, QUANTITY.... The shipper, consignee, holder hereof,

---

1. The symbol "SF." followed by a paragraph number indicates a citation to the stipulated facts.

2. In both the complaint and the stipulated facts Sea–Land claims only $144,565.20 in outstanding freight charges. The Court, however, in the course of ascertaining which charges were attributable to each of the three shippers, made an independent calculation of the total freight charges based on the freight bills which plaintiff introduced as exhibit four. This calculation reveals that plaintiff made an arithmetical error in calculating its claimed freight charges. The Court's computation reflects the freight charges actually proven at trial.

3. The symbol "Tr." followed by a page number, refers to the trial transcript.

and owner of the goods shall be jointly and severally liable to Carrier for the payment of all freight, demurrage, General Average and other charges, including but not limited to court costs, expenses and reasonable attorney's fees incurred in collecting sums due Carrier. Payment of ocean freight and charges to a freight forwarder, broker or anyone other than Sea–Land Service, Inc. or its authorized agent shall not be deemed payment to the Carrier and shall be made at payor's sole risk....

19. FINAL AGREEMENT. All prior agreements, dock receipts or freight engagements of the shipment of the goods and all other arrangements are superseded by this bill of lading and Freight Tariff Rules and Regulations of file with the Federal Maritime Commission, and Interstate Commerce Commission in the case of through transportation, which are incorporated herein by reference and form part of this bill of lading as if set forth herein at length. Copies of the Freight Tariff Rules and Regulations are available upon request.

(Exhs. 3, 3A, 3B)

Sea–Land's tariffs were the basis for the transportation charges incurred and the credit terms granted. The tariffs that applied to the shipments in this case provided that payment was due to the carrier upon presentation of the freight bill, except that the carrier could extend credit for fifteen days when evidence of financial security was furnished (Exh. 1).

In 1980, Sea–Land established a credit policy for new customers whereby it required shippers or consignees to provide a credit application, a set of financial statements, verification from their bank, and three credit references (Tr. 4). Old customers, however, who had been receiving credit prior to 1980, were exempt from these requirements (*Id.*). Amstar had been a customer since 1972 and, because Sea–Land had been extending Amstar credit since 1972 without any problems, Sea–Land had no credit application for Amstar in its file (Tr. 5–6). Consequently, Amstar was unaware that it was receiving credit from Sea–Land (Tr. 223).

Sea–Land had a policy against extending credit to freight forwarders (Tr. 4). Sea–Land adopted this policy because of the financial insecurity of freight forwarders who generally have few tangible assets (*Id.*). Accordingly, Sea–Land did not extend credit to Erskine (Tr. 27).

Albert Oettli, Sea–Land's collection agent in New Orleans, handled the collection efforts on the transactions at issue. He testified that under his general billing procedures, which he applied in this case, he did not consider an account overdue until fifteen days after the date of the bill (Tr. 76). Sea–Land had a central computer which generated dunning notices, and Oettli would send those notices out as they were generated (*Id.*). The first dunning notice would go to the freight-forwarder approximately thirty-five days after the billing date (*Id.*). If this notice did not generate a payment, he would send a final notice, this time to the shipper with a copy to the freight forwarder, approximately forty-nine days after the billing date (Tr. 77).

On November 20, 1984, Oettli sent Amstar a final notice covering the September 26, 1984 shipments (Exh. 13). Shortly after mailing that notice, Oettli called Erskine to inquire about the overdue bills. Erskine responded with a number of excuses (Tr. 87). Between December 3, 1984, and January 14, 1985 Oettli sent Amstar six additional final notices covering the remaining shipments (Exhs. 14–19).

Sometime in the middle of December, Oettli contacted John Catechis, the Sea–Land sales representative who handled the Amstar account, to inform him of the delinquent payments. Catechis testified by deposition that he met with Erskine's principal, Robert Cook, in December. Cook told him that Amstar had already paid the freight but that he had used the money for other purposes. He said that he had other money coming in and expected to pay in one week (Exh. P at 20–22). Erskine, however, made no payments and, after visiting Erskine's office two additional times, Catechis

learned that Erskine was going bankrupt (Exh. P at 24, 25, 27). In mid-January Catechis conveyed this information to Oettli who then referred the matter to the Corporate Credit Department as an uncollectible file (Exh. 12).

Sometime in early January Catechis also visited Robert Fortune at Amstar, and informed of the problems with Erskine (Exh. C). By mid-January Amstar began making all payments directly to Sea–Land (Exh. 7; Tr. 172).

Erskine's delinquency in forwarding Amstar's payments to Sea–Land extended to other shipments as well. To recover payments on these other shipments Oettli had sent final notices to Amstar as early as May 1984 (Tr. 78). Erskine was similarly delinquent throughout 1984 in forwarding payments on cargoes that Amstar had shipped from Elizabeth, New Jersey (Tr. 44). By January 8, 1985, the delinquencies had grown to the point that Joseph Proetto, the collection agent in Elizabeth, called Fortune at Amstar (Exh. S; Tr. 45, 46). Fortune responded by pressuring Erskine to pay and by January 21, 1985 Erskine had paid the outstanding bills from Elizabeth (Tr. 54, 55; Exh. D). Erskine, however, never forwarded the payments on the thirty-five freight bills that are the subject of this action.

## II. CONCLUSIONS OF LAW

■ Sea–Land argues that under the terms of the bill of lading, Amstar, as shipper, remained ultimately liable for the freight charges. A bill of lading is a contract of carriage between the shipper and the carrier. *Dietrich v. U.S. Shipping Board Emergency Fleet Corp.*, 9 F.2d 733, 741 (2d Cir.1925), *cert. denied*, 278 U.S. 647, 49 S.Ct. 82, 73 L.Ed. 560 (1928); *Tokio Marine & Fire Ins. Co., Ltd. v. M/V L. Jalabert Bontang*, 624 F.Supp. 402, 407 n. 5 (S.D.N.Y.), *aff'd*, 800 F.2d 1128 (2d Cir. 1985). Although a bill of lading is a contract of adhesion which requires ambiguities to be resolved against the carrier, *Mitsui & Co., Ltd. v. American Export Lines*, 636 F.2d 807, 822–23 (2d Cir.1981), there is no ambiguity in Sea–Land's bill of lading.

The Sea–Land bill of lading expressly provides, "Payment of ocean freight and charges to a freight forwarder ... shall not be deemed payment to the Carrier and shall be made at payor's sole risk" (Exh. 3). The bill of lading, therefore, clearly establishes Amstar's liability.

■ Amstar argues that Sea–land is not entitled to recover from Amstar because Sea–Land extended credit to Erskine through its lax collection procedures. Sea–Land relies on two cases in this district which held that the carrier was not entitled to recover from the shipper because the carrier had extended credit to the forwarder. *See Koninklijke Nedlloyd BV v. Uniroyal, Inc.*, 433 F.Supp. 121 (S.D.N.Y.1977); *Farrell Lines, Inc. v. Titan Industrial Corp.*, 306 F.Supp. 1348 (S.D.N.Y.1969), *aff'd*, 419 F.2d 835 (2d Cir.1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed. 2d 653 (1970).

In *Uniroyal*, the court relied on a number of factors, only some of which are present in the instant case, in determining that the carrier had extended credit to the forwarder. First, the carrier would not issue the bill of lading until the forwarder had initialled the freight-due bill. 433 F.Supp. at 123, 128. Second, the carrier initially looked to the freight forwarder for payment. *Id.* at 128. Third, the carrier's tariff contained a credit agreement which contemplated the extension of credit to the forwarder. *Id.* Fourth, the Court found that the carrier could have dealt directly with the shipper, but chose to use a forwarder for its own convenience. *Id.* at 128–29.

Of these four considerations, only the second is present in the instant case. Sea–Land did look to Erskine for payment in the first instance. There is no evidence, however, indicating that Sea–Land issued its bills of lading in exchange for Erskine's signature on the freight-due bills. Both parties have submitted copies of the actual freight-due bills and they do not show Erskine's signature. Moreover, neither the tariff nor any other document provides for the extension of credit to Erskine. Indeed, there was testimony that Sea–land had a

company-wide policy against extending credit to freight forwarders, and that it had never extended credit to Erskine. Finally, in stark contrast to the carrier in *Uniroyal*, Sea–Land had attempted to arrange for direct billing to Amstar, but Amstar rejected the proposal. It was only when it became clear that Erskine had misappropriated Amstar's payments that Amstar agreed to direct billing.

*Farrell Lines* is distinguishable on similar grounds. In *Farrell Lines* it was found significant that the carrier released the bills of lading in exchange for the forwarder's signature on the freight-due bills. 306 F.Supp. at 1350 & n. 20. In addition, it was found that the carrier could have billed the shipper directly, but for its own convenience chose to bill the forwarder. *Id.* at 1351. Neither of these considerations is present in the case at bar. Accordingly, it is clear that Sea–Land did not extend credit to Erskine, and that Amstar is liable under the bill of lading.

Even if these cases were not distinguishable, the Court would be reluctant to follow them in light of the decision of the Court of Appeals for the Fifth Circuit in *Strachan Shipping Co. v. Dresser Industries Inc.*, 701 F.2d 483 (5th Cir.1983). *Strachan* rejected the approach taken in *Uniroyal* and *Farrell Lines*, which framed the issue as whether the carrier had extended credit to the forwarder, and looked instead to whether the carrier intended to release the shipper from liability. Here, the carrier's intent to hold the shipper responsible for payment is expressly set forth in the bill of lading. Thus, under the reasoning of *Strachan*, Amstar is liable.

■ Amstar argues that Sea–Land's claim should be denied under general equitable principles, notwithstanding the bill of lading, because Sea–Land accepted the risk of loss by working through Erskine and failing to promptly advise Amstar that Erskine had misappropriated Amstar's payments. The bill of lading, however, protected Sea–Land from the risk of loss by expressly providing that payment to a freight forwarder is made at the payor's risk. In addition, Sea–Land's failure to notify Amstar of the misappropriated funds does not rise to the level of inequitable conduct. Sea–Land sent numerous letters to Amstar informing Amstar of Erskine's delinquency, and Sea–Land's representatives visited Amstar's offices in early January to discuss the late payments, both as to New Orleans and Elizabeth shipments. Having received this information, Amstar should have recognized that Erskine had misappropriated the payments. Sea–Land had no equitable duty to spell out the obvious implications of Erskine's failure to forward the payments.

Amstar argues that even if it is bound by the bill of lading, it is liable only for those cargoes on which it is listed as shipper. Sea–Land responds that Amstar acted as principal for Montrad and Feng Yang, and therefore is liable under agency principles for payment of the freight charges on the Montrad and Feng Yang shipments. Sea–Land's argument, however, inverts traditional agency principles.

■ In an agency relationship, the agent acts on behalf of the principal. Here, Amstar was acting on behalf of Montrad and Feng Yang by making payments on their shipments. Therefore, Montrad and Feng Yang were the principals, and this was disclosed to Sea–Land on the bills of lading. An agent is not liable for the contractual obligations of a disclosed principal. 3 Am. Jur.2d *Agency* § 302 (1986). Consequently, Amstar is not liable for the Montrad and Feng Yang shipments.

### III. ORDER

For the foregoing reasons, judgment is granted to the plaintiff in the amount of $89,574.84. Pursuant to the terms of the bills of lading, Sea–Land is entitled to attorney's fees, court costs and interest. Accordingly, plaintiff should submit a proposed order on notice incorporating these items into the award.

SO ORDERED.