**ARIEL MARITIME GROUP, INC., as agents for Transafrica Line, Plaintiff,**

v.

**ZUST BACHMEIER OF SWITZER-LAND, INC. and Royal Forwarding, Inc., Defendants.**

**No. 87 Civ. 4755 (IBC).**

United States District Court, S.D. New York.

April 15, 1991.

---

6. The subsequent history of *New York v. Harris*   is totally inapposite to this case.

Ronald Saffner, New York City, for plaintiff.

Cichanowicz, Kallan & Keane, New York City, for defendants; Deborah R. Reid, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Plaintiff Ariel Maritime Group, Inc. ("Ariel") commenced this action on October 20, 1987 to recover $21,997 in damages which it allegedly incurred due to the breach of a maritime contract by defendants Zust Bachmeier of Switzerland, Inc. ("Zust") and Royal Forwarding, Inc. ("Royal").

Ariel claims that it provided ocean carriage for eight 20–foot containers of calcium hypochlorite ("the containers") shipped by Zust from Savannah, Georgia to Matadi, Zaire via Rotterdam, The Netherlands, and it contends that Zust failed to pay the ocean freight charges when due, which failure delayed the shipment of the containers from Europe to Africa and resulted in additional handling, storage and demurrage charges being incurred by Ariel at the transshipment port. Ariel makes the same allegations against Royal. Ariel further contends that Zust made oral and written guarantees for the payment of the original shipping charges; consequently, it should be held liable for all additional charges incurred by Ariel because Zust intended to substitute or superadd itself for the shipper and to answer for the liability of the shipper.

Zust denies Ariel's allegations and contends that it was acting as the agent for the shipper. Zust denies making any guarantees, and further claims that if it made verbal guarantees, they are barred by the Statute of Frauds, and if it made written guarantees, they were made to third parties and Ariel was in error to rely on them. Lastly, Zust disputes the amounts of the various alleged charges and contends that certain of the charges could not possibly have been incurred by Ariel during the transaction that is the subject of this action. Additionally, Zust has asserted a crossclaim against Royal, claiming that if it is found liable, it is entitled to indemnification from Royal.

The case was tried before this Court on June 28, 1990. We base our disposition of this action on the findings of fact and conclusions of law discussed hereinbelow.

## FINDINGS OF FACT

Prior to March 22, 1987, the shipper, Ets. V. Fringhian ("Fringhian") (not a party in the instant action) of Marseille, France employed Cavalier (also a non-party), also of Marseille, as its agent to arrange for the shipment of the eight 20–foot containers of calcium hypochlorite from Savannah, Georgia to Matadi, Zaire via Rotterdam, The Netherlands. (Tr. 7, 12, 26, 86)[1] Cavalier subsequently contacted Zust in New York, and Zust became Fringhian's subagent, responsible for finalizing the shipping arrangements in the United States. (Tr. 87) Finally, Zust hired Royal as the freight forwarder for the transaction and Royal contacted Ariel to arrange for the shipment of the containers.

On March 22, 1987, Royal shipped the containers from Savannah and Ariel, as agent for Transafrica Line ("Transafrica"), issued Transafrica Bill of Lading No. NY–70067 to cover the shipment. (Tr. 7, 8, 12, 26; Ex. 2) The Bill of Lading specifically listed the shipper as "Zuest [sic] & Ba-

chmeier New York *as agents for* Ets. V. Fringhian ... Marseille/ France," and Royal was listed as the freight forwarder. (Tr. 7, 21, 22; Ex. 2) (emphasis ours) The Bill of Lading also specifically noted that the ocean freight charges, in the amount of $19,200, were to be prepaid (Ex. 2); nevertheless, those charges had not been paid when the ship on which the containers were loaded left Savannah on March 22, 1987. (Tr. 8, 70–1)

Ariel thereafter sent an invoice to Royal, dated March 22, 1987, for the full amount of the ocean freight charges. (Ex. 4) Ariel followed that with a letter dated March 27, 1987, to Mr. Brinkman at Royal, wherein was included a copy of the Bill of Lading and a demand for payment of the $19,200 "immediately upon receipt" of the invoice. (Ex. 3) The March 27 letter also "advised that if payment [was] not received the containers [would] be held at Rotterdam,[2] at [Royal's] expense." (*Id.*) Similar notice was given on the invoice: "Invoice payable in full. Any additional charges incurred[ ] will be for your account." (Ex. 4)

The president of Ariel, Martyn Merritt, testified before us that he had spoken with Mr. Peter Brinkman at Royal and Mr. Robert Shoemaker at Zust on numerous occasions, concerning nonpayment of the invoice, and they gave him verbal guarantees of payment each time; he responded by dismissing their verbal guarantees and insisting upon actual payment. (Tr. 11–2, 14) Merritt claims that Mr. Shoemaker worked for Zust at the time of the transaction in question because Shoemaker had given him a business card with Zust's name on it (Tr. 11); however, he admitted on cross-examination that the business card was not given to him until the parties met to discuss settlement of this case nearly a year after the transaction occurred. (Tr. 26) Further, the president of Zust, Thomas Graefe, testified that during the transaction "all

---

**1.** The letters "Tr." followed by a number indicate pages of the official trial transcript. The letters "Ex." followed by a number and/or letter indicate exhibits received in evidence at trial.

**2.** The evidence adduced at trial indicates that the containers were diverted from Rotterdam to Antwerp, and again to Ghent. They were then transported from Ghent to Rouen, and ultimately shipped from Rouen to Matadi. (Tr. 63, Ex. 6, 18)

communications between Ariel and [himself] went through Royal Forwarding," and that Zust had no direct contact with Ariel. (Tr. 73) In addition, Merritt had previously testified that he had no prior contact with anyone at Zust. (Tr. 47–8)

In the face of the conflicting testimony of these parties, and of the contradictions within Merritt's testimony, we entertain no hesitancy in adopting the testimony of Graefe, whose responses were direct and consistent. Conversely, Merritt's testimony was at best evasive and at worst blatantly misleading. The most egregious example was his misstatement of whom the bill of lading named as the shipper of the cargo, which is the major factual issue raised in this action. On direct examination, Merritt testified as follows:

Q. Referring to Exhibit P 2, can you please tell the court what that document is?

A. It is a copy of the through Bill of Lading that was issued from Savannah to Zaire.

Q. Who was the shipper of the cargo?

A. The shipper is stated as Zust and Bachmeier, New York. (Tr. 7)

Merritt also made a separate assertion that Zust was the shipper. (Tr. 13) However, on cross examination, Merritt testified as follows:

Q. In the upper left-hand corner of the bill of lading, there is a box which states "shipper/exporter," is that correct?

A. Yes.

Q. Would you please read the contents of that box, please?

A. It reads: "Zust and Bachmeier, New York, as agents for ETVS [sic] Fringhian."

*      *      *      *      *      *

Q. It does clearly state, however, that Zust and Bachmeier is acting as agent for Fringhian, does it not?

A. It states, "as agents for." (Tr. 21–2)

In addition to this glaring example, there were numerous other instances when Merritt offered inconsistent testimony. (Tr. 14, 45–8; 16–7, 42–3; 16, 28–33) In light of our findings regarding the credibility of the witnesses, we adopt the testimony of Graefe whenever inconsistencies appear, and we conclude that 1) Shoemaker worked for Royal during the transaction that gave rise to this action, 2) Ariel did not have any direct contact with Zust; therefore 3) Ariel did not receive any verbal guarantees from Zust.

On March 26, 1987, Fringhian sent a telex to the president of Zust, Thomas Graefe, guaranteeing payment of the freight charges to Zust if Zust would pay the charges to Ariel. (Ex. 7) On March 30, 1987, Zust sent a telex to Cavalier, urging the company to wire $19,200 for the freight charges because Zust was *"unable to outlay this amount on [Cavalier's] behalf"* and advising that if the charges were not paid by the time the containers arrived in Antwerp on April 4, 1987, the containers would not be transshipped. (Tr. 14–15; Ex. 6) (emphasis ours) In response, Cavalier sent a telex to Zust on April 2, 1987, guaranteeing payment of the ocean freight. (Tr. 13; Ex. 9) That same day, Zust sent a telex to Mr. Shoemaker at Royal, guaranteeing that Zust would reimburse Royal for the payment of the ocean freight charges to Ariel. (Tr. 13; Ex. 8) On April 8, 1987, Zust sent a telex to Cavalier, informing it that Transafrica required payment within that week and advising it that Fringhian's decision to pay the following week "[would] not do." (Ex. 10) On April 9, 1987, Zust again sent a telex to Cavalier, informing it that Zust still had not received the funds from either Fringhian or Cavalier. (Ex. 11) On April 10, 1987, Zust sent another telex concerning nonpayment of the freight charges. (Ex. 12) Finally, on April 15, 1987, Zust sent Ariel its own check for $19,200 to pay for the ocean freight charges (Ex. 13), which Ariel deposited in its account with Manufacturers Hanover Trust Company in New York on April 16, 1987. (Tr. 16, 42–3; Ex. 13, B)

Since payment of the freight charges was delayed, the cargo was not immediately transshipped upon arrival in Europe. (Tr. 30) On or about April 4, 1987, the containers were discharged in Europe. (*See* Tr. 30; Ex. 18) Thereafter, the cargo was transported from Ghent to Rouen and

shipped from Rouen to Matadi on or about April 24, 1987. (*Id.*) The total amount of additional charges allegedly incurred by Ariel in Europe for off-loading, storage, transportation, and on-loading was $4,227.03, which was subsequently billed to Zust on May 6, 1987. (Ex. 18) On or about May 13, 1987, the cargo arrived in Matadi, Zaire as Ariel had indicated to Royal via telex on May 12, 1987. (Tr. 85; Ex. D59)

On June 5, 1987, Ariel billed Zust for an additional $2,170.87 to cover attorney's fees and interest on the extra charges ($4,227.03) allegedly incurred in Europe. (Ex. 17) Finally, on April 13, *1988*, almost an entire year after the transaction occurred, and six months after this action was commenced, Ariel billed Zust for demurrage charges allegedly incurred by Ariel in Europe during April, 1987, at $30 per day per container. (Ex. 16) The $15,600 bill indicates that the containers would have to have been held for a total of 65 days at the transshipment port before being transshipped. (*See* Tr. 29–32, 84)

Presently, Zust has not paid the additional charges of $4,227.03, the attorneys fees and interest of $2,170.87, or the demurrage charges of $15,600.

## DISCUSSION

Before addressing the substantive issues of the instant action, we endeavor to clarify an issue regarding the named defendants. As was stated above, Zust and Royal were both named as defendants in Ariel's original complaint and amended complaint. While the docket file chronicles service of the complaint upon Zust, and appearance by counsel on behalf of Zust at all five pre-trial conferences, there is absolutely no indication that Royal was ever served with a copy of the original complaint. Additionally, the certificate of service contained in Ariel's amended complaint as well as Zust's answer—which contained a crossclaim against Royal—indicate that Royal was not served with a copy of those documents, either. There is further indication in the docket record that Royal was never served: there were no responsive pleadings or any other papers submitted for Royal, nor has there been an appearance by counsel on Royal's behalf.

Federal Rule of Civil Procedure 4(j) provides in pertinent part that "[i]f a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative...." The record overwhelmingly indicates that Royal was never served with the summons and complaint in this action, which was instituted nearly three years before it was moved to trial. Consequently, Ariel has not shown why service was not made on Royal; therefore, we dismiss Ariel's action, and Zust's crossclaim, as against Royal, and we continue in the disposition of Ariel's action against Zust. Fed.R.Civ.P. 4(j).

Additionally, Ariel contended at trial that Zust and Royal were in reality one entity because after the acts complained of in this action, Zust purchased Royal's assets. Zust maintained that it purchased a portion of Royal's assets, but they are still two separate corporate entities. Ariel's bare assertions, raised for the first time at trial, are wholly unsubstantiated by any credible evidence that Zust and Royal were or are now acting as a single entity; consequently, we decline to entertain such assertions.

*The Substantive Claims*

The instant action concerns the liability of a shipper's agent when the shipper fails to pay ocean freight charges when due and additional charges are consequently incurred. The primary issues presented are whether Zust was acting as an agent for a disclosed principal at all relevant times and if not, whether Ariel has fulfilled its burden of proving that the additional charges were actually incurred.

It is well-settled under New York law that an agent with no ownership interest in the goods who is acting on behalf of a disclosed principal is not liable for breach of contract by the principal. *See Seguros Banvenez, S.A. v. S/S Oliver Drescher,*

761 F.2d 855, 860 (2d Cir.1985); *Interocean Shipping Co. v. National Shipping and Trading Corp.*, 462 F.2d 673, 678 (2d Cir. 1972); *Sea–Land Serv., Inc. v. Amstar Corp.*, 690 F.Supp. 246 (S.D.N.Y.1988).

■ The evidence adduced at trial clearly show that Zust was acting as an agent for a disclosed principal, Fringhian, at all relevant times during the transaction. The Bill of Lading itself names the shipper as "Zuest [sic] & Bachmeier New York *as agents for* Ets. V. Fringhian ... Marseille/France." (Ex. 2) (emphasis ours) Graefe testified before us that this agency relationship was communicated to Ariel. (Tr. 21, 79–80) Even Merritt admitted that a full reading of the "shipper" box on the Bill of Lading unambiguously indicates that Zust was acting as an agent. (Tr. 21, 22) Indeed, Zust could not have made it more clear that it was acting as an agent for a disclosed principal; consequently, Zust is not liable, based on the theory that it was not acting as an agent, for any additional freight charges incurred on the principal's account.

■ However, an agent for a disclosed principal still may be liable on a contract in place of the principal if 1) it acted outside the scope of its agency, *see Seguros, supra,* at 860; 3 C.J.S. Agency § 362 (1973), 2) it acted fraudulently, *see i.e., Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 972 (2d Cir.1987), or 3) it clearly manifested its intention to bind itself instead of, or in addition to, its principal. *See Katara, supra; Hotel Constr., Inc. v. Seagrave Corp.,* 99 F.R.D. 591, 591–2 (S.D.N.Y.1983); *Spain v. Howard Holmes, Inc.,* 108 A.D.2d 741, 742–3, 485 N.Y.S.2d 87, 89 (2d Dep't. 1985).

■ Ariel has not alleged or introduced any evidence that Zust acted outside the scope of its agency or acted fraudulently; consequently, we find that Zust is not liable on the first two aforementioned theories. Ariel argues, however, that Zust made personal guarantees, first orally and then in writing, to pay the ocean freight charges, which guarantees demonstrate Zust's intention to be bound thereby in place of or in addition to its principal.

Ariel has failed to offer any credible proof that Zust made verbal guarantees. First, we addressed the issue of verbal guarantees in our *Findings of Fact, supra,* wherein we found, based on the facts, that Ariel had no direct contact with and therefore received no verbal guarantees from Zust. Furthermore, even if Ariel had offered such parol evidence, it would not satisfy New York's statute of frauds:

> When a party promises to answer for the debt of another, ... the benefit to the promisor is not apparent ... [Therefore], if it is to be enforceable under the statute, [it] must either be evidenced by writing or plaintiff must prove it is supported by a new consideration moving to the promisor and beneficial to him and that the promisor has become in the intention of the parties a principal debtor primarily liable.

*Martin Roofing, Inc. v. Goldstein,* 60 N.Y.2d 262, 263, 469 N.Y.S.2d 595, 596, 457 N.E.2d 700, 701 (1983); *Karl Ehmer Forest Hills Corp. v. Gonzalez,* 159 A.D.2d 613, 613, 553 N.Y.S.2d 22, 23 (2d Dep't. 1990); *see* N.Y.G.O.L. § 5–701(a)(2). Ariel has failed to show either requirement. There was no writing nor was there evidence that the alleged guarantees were supported by a new consideration and were beneficial to Zust. Hence, we find that such oral guarantees, if made at all, would be barred by New York's statute of frauds.

In addition, Ariel cannot now claim that it relied on alleged verbal guarantees when its president, Merritt, admitted at trial that when he received the alleged verbal guarantees from Brinkman and Shoemaker, he did not rely on them; rather, he rejected the guarantees and demanded immediate payment of the freight charges from the shipper. (Tr. 12)

Next, Ariel argues, based on a series of three telexes sent among Zust, Royal and Cavalier (Ex. 7, 8, 9), that it was given a written guarantee from Zust for the payment of ocean freight and other charges. Merritt testified that the telex of March 26, 1987 (Ex. 7) and the two telexes of April 2, 1987 (Ex. 8, 9) indicated to Ariel that Zust

was guaranteeing payment if Fringhian did not pay. (Tr. 13)

Zust contends that any written guarantees contained in the telexes, if made, were made to or by third parties, and none were directed to Ariel. Zust therefore claims that it never intended to substitute or superadd itself for the liability of the principal. We agree.

The first telex, dated March 26, 1987, was sent by Cavalier to Mr. Graefe at Zust, guaranteeing payment of the ocean freight to Zust on behalf of Fringhian. (Ex. 7) The second telex, sent the morning of April 2, 1987 by Cavalier to Ingrid at Zust, specifically stated "we [ (Cavalier) ] guarantee y[ou (Zust)] the oceanfreight payment...." (Ex. 9) Finally, the third telex, sent April 2, 1987 by Zust to Mr. Shoemaker at Royal, expressly guaranteed payment to Royal from Zust. (Ex. 8)

It is doubtful that Ariel could have relied upon these telexes as personal guarantees to Ariel by Zust when only one was sent by Zust and *none* of the telexes were addressed directly to Ariel or made any mention of Ariel at all. (Tr. 39–42, 81) Further, although the telexes may indicate that Zust was guaranteeing payment of the freight charges to *someone*, only the named obligee, Royal, could rely upon this "special" guarantee. *See Fed. Deposit Ins. Corp. v. Schuhmacher*, 660 F.Supp. 6, 8 (E.D.N.Y.1984); 38 Am.Jur.2d *Guaranty* § 20 (1968). Zust made no guarantees to Ariel; hence, Zust is not liable as a guarantor of payment. *Id.*

Finally, all three telexes specifically refer to the payment of ocean freight, not additional charges as Ariel contends, and the ocean freight charges were paid (Ex. 13, B; Tr. 24). Therefore, Ariel was in error to have exercised any reliance that the telexes would serve to guarantee payment of the additional charges.

Ariel has failed to convince us that Zust demonstrated an intent to be bound by the contract between Ariel and Fringhian or to substitute or superadd itself for the liability of Fringhian. Zust was not the owner or the ultimate consignee of the containers or the goods therein, nor did it have any interest in the goods themselves. We therefore find that Zust was acting properly as an agent for a disclosed principal at all times during the transaction in question.

■ Finally, even if we had found that Ariel has a right to relief from Zust, Ariel has failed to offer any credible evidence that it actually incurred the expenses alleged. Ariel merely offers its own invoices (Ex. 16, 17, 18), and one letter supplied to it more than sixteen months after the transaction (Ex. 15), and suggests that it was charged for additional handling, storage, transportation and demurrage in Europe. It also claims it is entitled for attorney's fees and interest.

The first alleged charges, including those for storage and handling in Europe, totalling $4,227.03, are represented by an invoice issued by Ariel. (Ex. 18) As supporting evidence that it had been charged for those expenses, Ariel submitted only a letter dated August 3, 1988 from Euro–Link International Shipping N.V. in Antwerp, Belgium. (Ex. 15) Euro–Link's letter states that a larger amount forwarded by Ariel "[included] the additional charges as per our advise to you of May 5, 1987." (*Id.*) Ariel does not, however, offer that May 5, 1987 "advise" or an invoice from Euro–Link that would connect those charges with the instant transaction.

The second invoice, for alleged attorney's fees and interest on the alleged damages of $4,227.03, contains a miscalculation: interest was calculated at 18% per month instead of the 18% annual rate provided for in the carrier's tariff. (Ex. 17; *see* Ex. 20) Further, the invoice for the $15,600 demurrage charge, which was sent a year after the transaction occurred, indicated 65 days of demurrage while the entire transaction lasted only 52 days. (Ex. 16, *see* Ex. D59) Again Ariel supplied no bill from the lessor of the containers. It is highly unlikely that Ariel could not secure a copy of that bill because the lessor shared the same office space, telephone, etc. as Ariel. (Ex. 5)

The record contains nothing more than self-serving invoices, fraught with mathematical errors and devoid of specificity, and

questionable letters dated more than one year after the transaction occurred (not to mention almost a full year after the instant action had been commenced); these documents do not convince us that Ariel ever incurred such charges.

## CONCLUSION

Ariel has not met its burden of proving that it actually incurred the damages alleged, nor has it established that it is entitled to relief from Zust. Accordingly, based on our findings of fact discussed hereinabove and the law applicable thereto, we are constrained to, and do, find in favor of defendant Zust and against plaintiff Ariel.

SO ORDERED.